J. G. BRIDGES, Executor, Plaintiff in Error, v. ROBERT AGEE, Defendant in Error.

Middle Section.   October 1, 1932.

Petition for Certiorari denied by Supreme Court, January 7, 1933.

E. C. Smith, and H. B. McGinness, both of Carthage, for plaintiff in error.

Solon Fitzpatrick, of Carthage and A. H. Roberts, of Nashville, for defendant in error.

DeWITT, J. This cause presented an issue of devisavit vel non, involving the validity of a paper writing purporting to be the last will and testament of Mrs. Lula Agee, who died at her home in Smith County on September 14, 1931. The alleged will was signed by Mrs. Agee on August 17, 1931, and was attested by J. W. Nixon, the cashier of the Bank of Hickman, and by F. B. James. The contestant is Robert Agee, son and only heir of a deceased brother of Mrs. Lula Agee. The grounds of contest are mental incapacity to execute a will, and execution of the will through fraud and undue influence on the part of Dr. J. G. Bridges, the physician to the alleged testatrix

and almost entirely the beneficiary under the said will. A trial of the issues before the Judge and a jury resulted in a verdict against the validity of the will. At the close of all the evidence the Circuit Judge had overruled a motion of the proponent for peremptory instructions in favor of the validity of the will. In overruling the motion of the proponent for a new trial the Circuit Judge stated that in his opinion evidence warranted the conclusion that Mrs. Agee was a person of unsound mind, part of the time at least, and that the proponent had not carried the burden of showing that she executed the will while in a lucid interval; and therefore on this the verdict of the jury would have to be sustained. Further he said that he thought that it appeared that she was on many occasions without testamentary capacity, and the presumption being that this continued until the contrary would be shown, and the burden being on the proponent to show it, he did not feel called upon and did not think that it was necessary to discuss the various phases of the case, the question of undue influence and fraud because the verdict of the jury was a general verdict. This statement must be interpreted as withholding approval of a verdict as based upon said grounds of undue influence or fraud. It is well settled that in order to review a judgment based upon the verdict of a jury, the appellate court must know that the verdict had the approval of the judgment and conscience of the trial judge. Hamburger v. Railroad, 138 Tenn., 123, 196 S. W., 144; Railroad v. Lee, 95 Tenn., 387, 18 S. W., 268; Curran v. State, 157 Tenn., 7, 4 S. W. (2d), 957; N. C. & St. L. Railway v. Perry, 13 Tenn. App., 268. Therefore in view of the aforesaid expression of the Trial Judge, this court will not consider the issue of fraud and undue influence, but will treat the verdict of the jury as sustaining the charge of testamentary incapacity.

The principal assignment is that the motion for a directed verdict in favor of the proponent should have been sustained, it being insisted that all the evidence that has any probative value or force is to the effect that at the time of the execution of the will Mrs. Agee knew what she was about and disposed of her property in accordance with her wishes.

Mrs. Agee was the widow of Ruben Agee, who died intestate in September, 1930, leaving a tract of about 65 acres, containing a residence, etc., and a considerable amount of bonds, notes receivable, money and other personal property. No children were born to her and Mr. Agee. For several years before his death Mrs. Agee had been afflicted with the disease known as combined schlerosis of the spinal column, rendering her unable to walk and confining her to her bed or a rolling chair. Her regular physician was Dr. J. G. Bridges, but during some of the last few weeks of her life she was also at-

tended by Dr. Dalton. Mrs. Agee's home was about one mile from the town of Hickman, while Dr. Bridges lived at Gordonsville, a few miles away. Upon two occasions Mrs. Agee was brought to Nashville for examination by specialists, the second occasion being in May, 1931, when she was placed in St. Thomas Hospital for a few hours and she was examined and her disease studied by Dr. McKinney, a specialist in neural surgery, and diseases of the nerves. The aforesaid disease with which she was afflicted brought about her death. There is abundant evidence that it was incurable and progressive. The will in question was drafted by Dr. Bridges. The operative parts of it are as follows:

"I give, devise and bequeath all of the estate, both real and personal, of which I may die seized and possessed, as follows:— First. I direct that all my just debts be paid as soon as practical. Second. I direct that the grave of my husband and myself be fenced with a good and substantial iron fence; and that an appropriate tombstone be placed at the grave of my husband, W. R. Agee, and myself, at a cost of one thousand dollars, or approximately that amount, provided I do not have this done during my lifetime. Third. I will and bequeath the sum of Twenty-five dollars to Mrs. Lillie Winfrey, wife of B. Winfrey. Fourth. I will and bequeath one-half of my household goods to Mrs. Eva Agee, wife of Alonzo Agee, both of whom are now living in house with me. Fifth. I advise, will and bequeath all the residue of my estate, real and personal, to Dr. J. G. Bridges. Sixth. I hereby nominate and appoint Dr. J. G. Bridges as Executor of this, my last will."

Prior to the execution of this paper Mrs. Agee had undertaken on three occasions to execute a will. In November, 1930, she requested a friend, Mr. J. F. Gwaltney, to write for her a will, providing for the erection of a monument and a fence at the grave of her husband, very near to her home; and then giving the balance of her property to two trustees to be used for the erection of a Christian Church at Hickman, although there was no congregation of that denomination at that place. Mr. Gwaltney testified that she said that she was sure that when such gift would take effect, such a congregation would be organized. On January 7, 1931, she undertook to execute another will, which Mr. Gwaltney had written at her request. She said that she had changed her mind. This will provided also for a monument and a fence. She gave her household goods to Mrs. Lillie Winfrey, a neighbor who had rendered services to her, and gave the residue of her estate to Dr. J. G. Bridges. Dr. Bridges was at her home at the time of the execution of this will but he testified, and it is not directly contradicted, that he had no knowledge or intimation of the contents

of this will until January 13th following. Mrs. Lillie Winfrey's husband, B. Winfrey, was a witness to this will but testified that he did not know at the time that it was a will which he was attesting and when he learned that it was a will he became doubtful as to its validity under the circumstances. On January 12, 1931, Mrs. Agee discussed with Dr. Bridges the question just raised and she decided to execute another will and agreed that Dr. Bridges should procure Mr. E. C. Smith, an attorney, to attend to the matter. On January 13th, Mr. Smith went to the home of Mrs. Agee and in the presence of B. Winfrey and W. B. Thomas as attesting witnesses, Mrs. Agee signed another will, which was identical in its provisions with the will of January 7th.

The law fixes the standard of mental capacity, that is, the testator must be of sound and disposing mind and memory, sufficiently sound to enable him to know and understand the business in which he was engaged at the time he executed his will. Pritchard on Wills, section '99. One is not rendered incapable of making a will by mere physical weakness or disease, old age, eccentricities, blunt perception, weakening judgment, failing mind or memory. In other words, these are not necessarily inconsistent with testamentary capacity. The mind may be sound although the vital or mental capacity may be weak. A person may be capable of disposing by will and yet not capable of making a contract or managing his estate. Pritchard on Wills, section 100; Smith v. Harrison, 49 Tenn., 23; Nailing v. Nailing, 34 Tenn., 630; State ex rel. v. Goodman, 133 Tenn., 375, 181 S. W., 312; Fitch v. American Trust Co., Administrator, 4 Tenn. App., 87. The test is whether or not the mind of the testator is sufficiently sound to enable him to understand what he is doing in making the will, and when facts are adduced for the purpose of showing the want of such mental soundness, whether or not such facts are inconsistent with sanity. To avoid the will the evidence must be directed to the very time and act of making the will. Fitch v. American Trust Co., Administrator, supra. In other words, the point at issue is the mental capacity of the testator at the time of the making of the will, but evidence of mental condition both prior and subsequent thereto, within some limits, is receivable for consideration, stress being always properly laid on the truth that these conditions are merely evidential toward ascertaining the mental condition at the precise time of the act in issue. "The point of time to be looked at, is that when the will was executed . . . The will permits of such prior and subsequent incapacity to be given, but unless it bear upon that period, and is of such a nature as to show the incompetency when the will was executed, it amounts to nothing." 1 Wigmore on Evidence, section 233, pages 291-292.

Evidence of the testator's mental and physical condition before, at and after the execution of the will, his appearance, conduct and conversation and declarations, and well marked change of character or habits without sufficient cause, existence of insanity in blood relations, or other particular facts from which the condition of the testator's mind may be inferred, is competent on the issue of want of testamentary capacity at the time of the making of the will. Gibson v. Gibson, 9 Yerg., 329; Norton v. Moore, 4 Head, 380; Puryear v. Reese, 6 Cold., 21; Bladles v. Alexander, 9 Bax., 604; Linch v. Linch, 1 Lea, 526; Maxwell v. Hill, 89 Tenn., 584, 15 S. W. 253.

The rule is further that when insanity is shown to have existed before the execution of the will the presumption of law is that it continues, unless the malady or delusion under which the testator labored was in its nature accidental and timely, and the burden of showing capacity at the time of the execution of the will is shifted upon the party insisting upon its validity. Ford v. Ford, 7 Humph., 92; Smith v. Smith, 4 Bax., 293; Haynes v. Swann, 6 Heisk., 560. It is true that no particular measure of proof is necessary to establish a lucid interval, or the existence of such a state of mind as the law deems requisite to the exercise of the testamentary privilege; that the proof must be sufficient to overcome the presumption that naturally arises in the mind after the person is shown to be of unsound mind. Puryear v. Reese, supra.

Upon the subject of mental capacity of Mrs. Agee, certain hypothetical questions were propounded to Dr. McKinney by counsel for both the contestant and the proponent. These questions contain adequate summaries of the evidence relied upon by each party in support of his contention. The questions propounded to Dr. McKinney by counsel for the contestant and his answers thereto were as follows:

"Q. Doctor, suppose she was a refined, educated, intelligent, cultured lady and that up to the time she was stricken with this disease, she was a woman of chaste language and then suppose that she was a woman who had gone along, had a husband, a good man, and was contented and happy with her people and her neighbors and that in the last year of her life, that she conceived the idea that her neighbors were trying to take all of her property away from her and repeatedly said so; that she would go for many nights at a time and cry and curse and scream until she could be heard by neighbors half a mile away, and that she would convulsively grip at the cover, and that she would talk about her husband and call him and look out at the window and call him and tell him to come there, that they were killing her, and he was dead and had been dead and she knew he was

dead, and that she even went to the point of having a will written and in the will directed that a monument be erected to her husband's grave and at her grave and she herself had had a nice monument erected at her husband's grave and that monument was in sight of the house where she was confined at the time and that she would curse her attendants with the vilest of oaths and that this would go on almost every day. Now, what would you say about whether or not this particular woman, in your judgment, if she did all those things, just assuming for the sake of the question, and for the hypothetical question, that she did; would you say that indicated a sound or an unsound mind on the part of this woman? A. I would think it was unsound. All those things, yes, sir.

"Q. If she did those things, you would think her mind was unsound, wouldn't you? A. Yes, sir.

"Q. There wouldn't be any doubt in your mind as to her mind being unsound? A. Not knowing the facts or provocation of the individual acts; without knowing that, I would say there would be no question."

\* \* \* \* \*

"Q. I will ask you if persons afflicted with Senile Dementia many times don't have delusions? A. They do.

"Q. And if those—for instance if a man or woman gets in his or her mind that his neighbors or his friends—honest people are trying to rob him, going to take everything he has away from him—if that isn't a manifestation of that sort of disease? A. Yes, sir, it may be.

"Q. I will ask you if that doesn't point to a breaking down of the mind of the person—of the individual? A. It does."

\* \* \* \* \*

"Q. Then would that indicate to you that her mind was failing? A. It probably would suggest it, yes, sir.

"Q. Doctor, what would this indicate to your mind; if this lady say would eat her breakfast—say at six or six-thirty—and in five or ten minutes, would say, "It is time for dinner," that she wanted her dinner, which we country people mean the noon meal. What would that indicate? A. Loss of memory.

"Q. What would that loss of memory indicate—a failing mind? A. It would mean it at the time if it was repeated.

"Q. At the moment, that would mean a failing mind? A. Yes.

"Q. A failing of the proper functioning of the mind? A. Yes."

\* \* \* \* \*

"Q. Suppose a person makes a will in November, we will say, and undertakes to will all of his property to a church to which he does not belong and then in the following January, undertakes to, and makes an entirely different will and wills all his property to another person, and then in August following makes another will and wills all his property to his doctor, who is no kin to him in any way. Now, my question is this. Does that point to Senile Dementia, assuming the relations and all of the surroundings have not changed in the meantime?"

Mr. McGinness: "My criticism and objection to that is that you don't state the contents of the January will."

Gov. Roberts: "Well, I don't think anybody knows the contents of it. This witness Gwaltney don't know. I understand it was made to an unknown person. That is all I know—just made to an unknown person. That is as far as I could go with it."

"Q. What do you say about that, Doctor, those changes from January, or from November to January, and from January to August, in a person who had Combined Schlerosis of the Spinal Cord, that died on September 14, following these. Would that indicate mental disorders or not? A. In my opinion, it would if the circumstances were the same as originally.

"Q. It would indicate mental disorder? A. Yes.

"Q. In other words, assuming the relatives occupied the same relationship with him? A. No change of attitude, the same relations.

Q. You would think a person that would do that, it would indicate some disease of the mind, wouldn't you? A. Yes.

"Q. That would represent an instability of the mind, wouldn't it, Doctor? A. Yes."

\* \* \* \* \*

"Q. In other words if this lady, when people would come there or when people would pass along in front of the house, just neighbors, just driving by in the road, if it would excite her and she would curse and swear at them and then if anybody would come in the house, that she had that secretive disposition, and had never had it before, but she would want everybody to go out of the room when anybody visited her, I will ask you whether or not, Doctor, that would indicate a change in the mind some way, a deceased condition of the mind? A. You mention in this last question, this particular individual.

"Q. Yes, this particular individual. A. In the previous questions—

"Q. Yes, I am speaking about the old lady you saw. A. In the previous question, you used the words Senile Dementia, and follow it with this.

"Q. I am not referring especially to Senile Dementia now. A. Phychosis.

"Q. Wouldn't that indicate a diseased condition of the mind? A. I answered yes, Phychosis.

"Q. Doctor, when you examined her and the history you got, nobody told you about her having changed from a peaceful, cultured, refined lady, educated with chaste language, to a woman who would curse and swear and revile people, nobody told you anything about that when you examined her, did they? A. No, sir, I don't recall that they did.

"Q. You didn't ask about that, it didn't occur to you, did it? A. I don't recall that I asked that question.

"Q. And nobody told you that she couldn't sleep at night and that she would get one nurse and keep her three or four days, kept one seven days, and one nine days, and just wear these nurses out with her railing, screaming and cursing? A. Nobody told me about that she had had great pain and discomfort and had required luminal, drugs of that type, to attempt to control her distress."

\* \* \* \* \*

"Q. Doctor, if this lady, who was some fifty-two or fifty-three years of age when she died, the 14th of last September, married in the year 1913, a good man, had a good home or cottage, and associated with her friends and the public generally as any other woman cultured and refined would do, was never known to use any profane language of any kind and was afflicted as you saw her and then during the last few months of her life especially would have everybody to retire from the room when anybody would come in, just a neighbor woman, would come into the room, or her doctor would come in, or any relative would come in, she would want everybody to leave the room and to stay out until this person left and that had never occurred prior to her sickness, would that indicate a mental change, Doctor? A. I don't think it would necessarily, based on the fact that she may have been annoyed by company, as when a sick individual is glad to get the relief, and let the visitor who had come converse with her without the presence of the others.

"Q. Do you think that is evidence of an unusually strong mind? A. No.

"Q. You don't think that? A. No, I don't think that.

"Q. Did you ever have a patient in your life that did that?

A. Rudely order everybody out every time—no.

"Q. Anybody just order everybody that come in, everybody present out of the room, make that a regular habit and custom, wouldn't that indicate— A. I would think she had changed.

"Q. You would think that that was a mental deterioration, wouldn't you, Doctor? A. Mental impairment rather than deterioration.

"Q. Doctor, I want to ask you this question. Isn't it a fact with respect to people who have mental disease that a great many of them retain their full mental vigor with respect to certain things; in other words, they might be good mathematicians and might solve difficult problems in arithmetic and algebra, isn't that correct? A. Yes that may be true. They might be able to do that at times. I don't think they would continuously retain that faculty of carrying on."

\* \* \* \* \*

"Q. Suppose this lady had a good husband, a good man, and she would refer to him and say he had died and gone to hell where he ought to have gone and that she was going to die and go to hell; would you say that indicated any mental breakdown, Doctor, or would that just indicate she was still just that same sound minded woman you are talking about? A. Lots of us might feel that way about it, but we don't express it in that way. For that reason, I would have to say it was an unbalanced statement.

"Q. An unbalanced mind, wouldn't you, have to say, Doctor; you say this as a professional man; that where a man and woman live together many years, and say the man died and left his wife, and his wife would say that he had died and gone to hell where he ought to have gone and that she was going to die and go to hell; wouldn't that indicate to your mind a distinctly diseased mind? A. It is difficult to make an answer, to make that correct. It is certainly an unbalanced statement, but if that was the only statement she had ever made of that kind, there might have been some temporary influence that might have caused the individual to make that statement. Yes or no does not answer such a question accurately. It gives the wrong impression either way.

"Q. Suppose it was invoked by no— A. No provocative— no drug?

"Q. No drug, no provocative remark by anyone else. A. And you knew she didn't believe it?

"Q. Well, yes, I might say that back before her sickness, she didn't believe it. A. As indicated, unsoundness.

"Q. That would indicate unsoundness wouldn't it. A. Yes, sir."

. * * * * *

"Q. Considering that this old lady had been stricken about six years before and that she had suffered a rapid—comparatively rapid deterioration of the spinal cord to such an extent that within a year or two after she was stricken, she got to the point where she couldn't walk and had to be lifted out of bed into a rolling chair and that she gradually grew worse and finally died on September 14, 1931, after some five or six—approximately seven years of this disability, growing gradually worse, having been either in bed or in a rolling chair for at least four or five years and that during that time she had suffered excruciating pain almost very day or every night. Now, wouldn't that have a tendency to impair her mind, and didn't it have a tendency to impair her mind? A. It might have."

The questions propounded to Doctor McKinney, on re-examination, by counsel for the proponent and the answers of the witness thereto, were as follows:

"Q. Your answers to the hypothetical questions propounded by the attorney for the defendant were based on the assumption that each and all of the symptoms included in the hypothetical question actually existed and were present with the supposed person? A. Yes.

"Q. Did you not? A. Yes.

"Q. Now, you were shown a letter which it is assumed was written by Mrs. Lula F. Agee and addressed to one W. S. Thomas, and the letter was read to you. State whether or not the actual surrounding circumstances under which the letter was written would not be an important consideration in forming an opinion as to the condition of the mind of the person writing the letter? A. It would.

"Q. Now, assuming that the writer of this letter was the widow of a deceased man and that they had no children; assume that under the will after payment of the debts of the husband, the writer of this letter was entitled to the whole personal estate; assume that the man Thomas to whom the letter was written had qualified as administrator of the deceased husband of the writer of the letter; assume that all of the debts had been paid and that the writer of the letter was, as suggested, entitled to the entire residue of the personal estate. Assume that the administrator had in his hands a number of notes of substantial amounts on persons that were good and solvent and that the notes were drawing interest. Assume that the writer of the letter was

taking the position that she didn't want the notes collected, that she wanted the property to remain in notes so that she could receive the interest on the notes and that she was saying that if the notes were collected and the money paid to her, she would have to lend to other persons and take new notes; and assume that the administrator was saying to her, "I refuse to make settlement of this estate, and turn over to you these notes in species, but I propose to take whatever time is necessary to reduce the notes to cash and then turn over to you the 'cash'. Suppose she had insisted in person with the administrator that he make settlement and turn over the notes instead of taking time to collect the notes and thus require her to lend to other persons—Under these circumstances, would you say that a letter of the character that has been read to you and which you have seen would or would not indicate an unsound mind? A. That is a long question to answer with a short answer.

"Q. Would you say that the letter read to you, assuming the circumstances to be as set out, would be the letter of a mind that was functioning normally? A. Abnormally to the extent of at least distress and emotional repetition in order to carry her point, would be about the best answer that I can make to it.

"Q. Would you say such a letter, under such circumstances, would necessarily indicate an unsound mind? A. Unbalanced at the time.

"Q. Now, I don't think very much of hypothetical questions, but I am going to ask one. Suppose a person is shown to have continuously made contracts with different persons to work for her, the person being a woman, in her home, that the contracts so made were reasonable and that she made settlements with the various persons employed, writing her check for the amount due in the usual manner; that is, writing the checks in the usual manner in which checks are ordinarily written; that she could, and did, accurately calculate the amount due the employee—for instance accurately calculating the amount due for nine days' work at the rate of $4.25 per week; that when a servant would notify her she was leaving in two or three days, the person in question would, and did, take steps, by telephone or other means, to arrange for other help; and that upon one occasion she called a neighbor and told her she had read an advertisement in a newspaper of some person in Nashville wanting employment and giving to the neighbor the name of the person and the telephone number and asking the neighbor to call the person so advertising and ascertain whether she would come and stay with her and requesting that she ascertain what her charges would

be; and that when the new servant would come into the home, she would give her accurate information as to where various items of provisions and household articles required to be used by the servant might be found; that she would habitually send the servants to the store for articles that she actually needed and would send the correct amount of money or write checks for the correct amount in payment of the articles and that she transacted ordinary business of this kind for herself and without any assistance on the part of anyone else. What would you say that sort of conduct indicated as to the mind of the person? A. The normal functioning of the mind.''

Dr. McKinney's personal acquaintance with Mrs. Agee was limited to about one hour. He described the disease as causing a complete paralysis of the lower extremities, and loss of sensation; but that it would not be expected to affect the brain. From his observation of the lady, her responses to his questions, her general appearance, demeanor and conduct, it was his opinion that she was of sound mind. He had known nothing of her conduct and expressions described in the hypothetical questions.

Dr. W. B. Dalton, of Gordonsville, testified that he knew Mrs. Agee for some ten years prior to her death; that between July 24th and September 13, 1931, he made seven professional visits to her, having been called in consultation by Dr. Bridges. He talked with her about her ailment and condition and she responded readily. From his conversations with her he was of the opinion that she was of sound mind. On cross-examination he stated that he had never heard of statements and conduct on her part which were set forth in certain questions propounded to him. These questions and his answers thereto, were as follows:

''Did Dr. Bridges, the old lady or any of them tell you about these spells she had been having for a year or two when although she had lived to be around fifty years of age, a woman of fine character and good reputation, with the use of chaste language, a woman of intelligence and culture, and refinement and good morals, in happy surroundings, not given to profane language, cursing or rough, course, indecent expressions; and would after that while she was down there sick, curse people at night, sometimes go night after night all night practically; she would be sleepless, this insomnia you talked about would prevent her sleeping and she would suffer and she would scream and cry and curse to the point that her neighbors at least one neighbor half a mile away could hear her screaming, and that she would sometimes curse half a day at a time? A. I never heard it.

"Q. Wait a minute. With no apparent reason for it, just break out to cursing and crying; and she would talk about her husband, whom she knew to be dead, and say that he was dead and in hell and ought to have died and that she was going to die and go to hell; and that her people were trying to rob her and take everything she had and that Will Thomas, her husband's administrator, was tearing up her notes and she didn't have anything, and that referring to her legs as her damned legs, say she was going to have them cut off and thrown in the floor and want her nurse to go get a switch and whip her legs; and she wouldn't allow her nurses and people waiting on her to cook enough for fear she would be left in want although she had chickens there on the place, and other provisions; and she would roll her chair in the kitchen and wouldn't let her nurse cook but one egg and eat that herself, and the nurse had to go out and suck eggs for a living; that other nurses would have to bring food from home; and that sometimes she left like she was in absolute danger of absolute want; did anybody ever tell you about that sort of condition existing? A. No.

"Q. If they had told you that, what would you have said about her mind? A. I don't know hardly what to say to that.

"Q. You would have thought then she was a person of unsound mind? A. Looks like acting the fool.

"Q. That is not acting the fool, is it, Doctor, where a man and woman have been living together many years in an affectionate relation of husband and wife; then the husband dies and the wife says he is dead and in hell and ought to be in hell; that is not foolish; that is crazy? A. It is suggestive of craziness.

"Q. Isn't it more than suggestive? Isn't it an evidence of an insane mind? A. Well, she might have been under the influence of some drug or she might have been diseased in such a way as to produce these abnormal ideas.

"Q. Well, you can account for that several ways; and one way was to be under the influence of a drug? A. Sure.

"Q. Do you know whether she was taking these powerful drugs that would produce that all back during the time this was happening, if it was happening, in the latter part of 1930 and the early part of 1931? A. No, sir, I do not, only the times I saw her.

"Q. Were there any drugs then when you went there? A. Not that I know of.

"Q. You didn't see them? A. No."

The assumptions of fact embodied in all the aforesaid questions propounded to these medical experts were all based on testimony

given by many witnesses. It is unnecessary, for purposes of this opinion, to set forth the testimony of each of them in detail. Among them were Miss Eddie Sue Patton, a trained nurse, who nursed Mrs. Agee for fourteen days, beginning November 30, 1930; Mrs. Braden, who nursed her from January 20th to 27, 1931; Mrs. Ada Addison, who nursed her for ten days in February, 1931. From their testimony the jury could reasonably infer that Mrs. Agee was of disordered and unsound mind during the times of execution of the first three wills.

The statements and conduct of Mrs. Agee which they described were in large part the basis of the answers given by Doctors McKinney and Dalton that a person guilty of such statements and conduct would not be of sound mind. It is true that the will in question was almost a counterpart of the will signed in January, 1931; but a previous will must have been executed by a testator in sound mind, to have any weight.

A witness, Mrs. Daisy Winfrey, testified that before the death of Reuben Agee she visited at his home several times; that Mrs. Agee would "take spells of cursing him just like she was wild and crazy," without any apparent reason, as her husband was good to her; that she would scream and cry, chew dish rags, put raw dough in her mouth and chew it; and that she tried to cut him with a butcher knife.

Kate Western, an old negro woman, testified that she washed clothes for Mrs. Agee for several years; that Mr. Reuben Agee was a good man; that when Mrs. Agee was in good health, before the chronic disease took hold of her, she was as good a woman as ever lived, but that after "she took that rolling chair she done lost her mind." She said that she did not want to "disgrace her white folks graves" by using the language that Mrs. Agee used; that she talked about her husband like a dog; that her mind was unsound. She said that Mrs. Agee said that Robert Agee, the contestant, was "the best one of the bunch," that "she loved his big toe better than she did any of the rest." There is evidence that Robert Agee visited her four or five times during the last few weeks of her life; that he is a worthy young man with wife and child; and there is no evidence that he gave to his aunt any just cause for any antipathy toward him.

A number of other witnesses testified that the acts and statements of Mrs. Agee, claimed as evidences of unsound mind, continued until the time of her death. Among these are, Mrs. Nan Nolan, who nursed her for about three weeks in May, 1931; Mrs. B. Winfrey, who spent seventy-two nights at Mrs. Agee's home; Mrs. Gertie Moss, who nursed her for nine days early in July, 1931. After stating facts

tending to show mental unsoundness, these witnesses expressed the opinion that Mrs. Agee was of unsound mind. Mrs. Sam Thomas, Mrs. Anderson, Mrs. Denny, who had many contacts with Mrs. Agee during that period, testified in detail in corroboration of these other witnesses as to her statements and conduct. Their opinion was that she was not of sound mind.

Mr. B. Winfrey said that when Mrs. Agee was indulging in such statements and conduct, if anyone came in she would hush, and when that person left she would commence again. The acts and statements referred to were in large part those described in the hypothetical questions propounded to Doctors McKinney and Dalton. It is deemed unnecessary to repeat the description of them. They were inconsistent with sanity.

We do not attach importance to the fact that the will in question provided for the erection of a monument when one had already been purchased by Mrs. Agee and had been erected and was visible from the window of her kitchen. This was the work of Dr. Bridges when in writing the will he copied largely from the former will and overlooked the fact that the monument had been erected. It may be inferred that Mrs. Agee did not notice this provision when she signed the paper. There was room in the evidence for doubt whether or not the will was read over to her or read by her before she signed it.

Nor do we think that the mere act of Mrs. Agee in demanding of Mr. Thomas, the administrator of her husband's estate, an immediate settlement of the estate and delivery of the remaining personalty to her, when she was entitled to it and all debts and expenses had been paid, should be appraised as evidence of unsoundness of mind. But, although she may have been unlettered, there was in the character of one of her letters to Mr. Thomas some evidence upon which Dr. Dalton could predicate his opinion that it indicated that the writer was "very uneducated or irrational in her statements or didn't have proper conception of what she was wanting to say, or something." This letter bore no date nor was itself addressed to anyone nor signed; but it is in the handwriting of Mrs. Agee and was postmarked April 2, 1931. It is as follows:

you brind me that personal. and. will. dont spend none for inheritance taxes for we did not have much for we needed it for our bad sickness so bring me my personal it mine you dont haft to give it to every body you bring our money back we got bad sickness here dont spend no more bring it back here for bad sickness you bring my money back to day i am in bad fix cant walk a step an guit pay every body will you bring that money back i ann bad off and meed it it im sick it mine and me cripple So bring i the one ought to have it will you bring Rubin money back he wanted me to have it for my

bad sickness it woldent suit Rubin and it dont suit me so bring that money im Low and it ,woring me to death and it got me down you bring that money back for i am in a bad fix be sure you dont spend it we can not pay inhertence Taxes for we are too sick will you bring my money back it ahame to do any body like you me and me in such fix it mine you bring it to day no more me and as bad off (word illegible) i am. you let old taxes go and bring my money back to day i bad off and me and Rubin didnt have much mow you bring my money back to me and dont pay every out of it. and me Will when them airs got the real estate i ought to got the personal rite them Rubin did not want his buisness out and he wanted me to have it. for my sickness and i dont get none there 26 got his money any body can get it but me you bring it to me i ought to have had it before now

The evidence tending to show mental unsoundness was sufficient to shift to the proponent the burden of showing capacity at the time of the execution of the will. It was for the jury to determine whether or not the proponent had carried this burden. The question whether or not Mrs. Agee had lucid intervals and the will was executed during such an interval, was involved in serious conflict. The evidence showed without dispute that Mrs. Agee did make contracts with different persons for work on her farm, that they were not unreasonable contracts, that she could make out and sign checks for proper amounts, that she made settlements with persons employed, calculating accurately the amounts due them; and that when a servant would notify her she was leaving in two or three days Mrs. Agee would take steps by telephone or other means to arrange for other help; and that she did transact ordinary business of this kind for herself and without any assistance on the part of anyone else. Nevertheless, there was abundant evidence tending to show that during all the period in which she did these things she would make the statements and pursue the conduct which was shown as tending to show mental unsoundness. There is abundant evidence of rational motive on her part of excluding her brother Exom Agee from her bounty; that there was a very bitter feeling between them; that upon one occasion when she visited his home in order to visit her unmarried sister Alice Exom Agee not only ordered her out of the house, but got his pistol and then dragged her out of the house in her rolling chair. There was also evidence that she said that while she liked her sister Alice she did not want to give her anything because Exom would finally get it. There is no evidence of any substantial motive on her part for excluding her nephew Robert Agee from her bounty, unless it was that she had the idea that he would not come to see her. There is testimony of several witnesses that he did come to her home to visit her several times during the last few weeks of her illness. The

witnesses Nixon and James and the attorney Mr. E. C. Smith testified very fully as to the details of her signing the will in the presence of the witnesses; and they were of the opinion that she was of sound and disposing mind and understood what she was doing on that occasion. However, the jury could conclude reasonably from all the testimony, that there was back of all of it an insane condition leading her to make such a will.

The verdict of the jury upon this conflicting evidence is conclusive upon this Court. It has been approved by the trial judge. We are unable to hold that there is no evidence to support the verdict and that it was error not to sustain the motion for peremptory instructions in favor of the validity of the will.

Certain instructions given by the trial judge to the jury are challenged as constituting reversible error. The particular sentence under attack is as follows: "contestant insists that Dr. Bridges, the chief beneficiary under the will was not only the physician of testatrix and thus, owing to her fatal malady which rendered her the easy prey of outside influences, but that he was also the agent and business adviser of the deceased." The point made is that the clause "owing to her fatal malady which rendered her the easy prey of outside influences," amounted to an assertion by the Court, at least an assumption of the fact that testatrix had a malady which rendered her the easy prey of outside influence, while all the competent proof in this particular was exactly to the contrary. We are unable so to interpret this language of the trial judge. Taking the clause in connection with the rest of the sentence, the jury could not misunderstand his meaning—that it was merely the insistence of the contestant that her fatal malady rendered her the easy prey of outside influence.

It is also insisted that it was error to charge the jury that if the relation of physician and patient was shown to have existed between Dr. Bridges and testatrix he was thereby afforded peculiar opportunity for unduly influencing the mind of testatrix, and that such relation created a suspicion that such influence might have been exercised. What the trial judge said to the jury upon this point is as follows:

"If such situation and confidential relation is shown to exist, then the existence of such confidential relation between the testatrix and the legatee or devisee gives particular opportunity for unduly influencing the mind of the testatrix and creates a suspicion that such influence may have been exercised; and when a will is executed through the intervention of the person occupying the influential position to his advantage, the law casts upon him the burden of removing the suspicion by showing that the will was the free and voluntary act of the testatrix."

There was no error in these instructions. The rule thus stated was taken almost literally from the text in Pritchard on Wills, section 143. It states a rule of law, and the trial judge was entitled to propound this rule to the jury for its guidance. He did not declare that such confidential relation did exist, but he set it forth hypothetically and then declared properly the legal consequences of such a relation.

It results that all of the assignments of error are overruled and the judgment of the Circuit Court is affirmed. The costs of this appeal will be adjudged against the plaintiff in error and the sureties on his appeal bond. The cause will be remanded to the Circuit Court in order that the verdict and judgment may be certified to the County Court, to be entered of record.

Faw, P. J., and Crownover, J., concur.