MELODY v. HAMBLIN et al.—115 S. W. (2d), 237.

Middle Section.   October 30, 1937.

Rehearing Denied November 27, 1937.

Certiorari Denied by Supreme Court April 2, 1938.

690

Tyne, Peebles, Henry & Tyne, of Nashville, for John Melody, executor.

Walker & Hooker, of Nashville, for Neal J. Hamblin and Ernest Hamblin.

FELTS, J. This is a will contest, involving the validity of a paper writing purporting to be the last will and testament of Julia Sunday Hamblin, deceased. The contestants are her surviving husband, Neal Hamblin, and her stepson, Ernest Hamblin. The ground of contest is that she was of unsound mind. There was a verdict and judgment in the circuit court against the will. John Melody, who was named executor, and is the proponent, has appealed in error and assigned twenty errors.

Through these assignments he insists that a verdict should have been directed for him, because the contestants were estopped to make the contest, and because there was no evidence that Julia Sunday Hamblin was of unsound mind at the time of executing the will; and that, at any rate, a new trial should be granted for errors in the admission of incompetent testimony, errors in the instructions given, and errors in the refusal to give the instructions requested by the proponent.

The will was executed March 19, 1929. It was written in longhand by Mr. Thomas J. Tyne, Jr., a member of the Nashville Bar. Mrs. Hamblin signed it in the presence of him and his associate, Mr. J. M. Peebles, both of whom witnessed the will. She died September 15, 1935. She left an estate of more than $20,000, consisting of about $18,000 of personalty, the home place, where she, her husband, and stepson had lived, worth about $2,000, and another lot, worth perhaps $1,000. By the will she gave the home place to her stepson, $2,000 to her husband, and all the balance of her estate to the Catholic Church and certain other charitable or religious institutions. She gave $3,000 to the Roman Catholic Church of the Assumption, of Nashville, Tenn., of which $1,000 was for the purpose of having masses said for the repose of her soul, $1,000 for the purpose of having masses said for the repose of the souls of her family, and $1,000 to be used in any manner the pastor or priest in charge might see fit. She gave $1,000 to the Catholic Church Extension Society, located in Chicago, Ill., $1,000 to the Franciscan Missionary Society, located in Cincinnati, Ohio, $1,000 to the Home for Boys at 1060 Lackawana, N. Y., $1,000 to the Junior League, $1,000 to the Little Sisters of the Poor at Nashville; and the residue of her estate, real and personal, she directed to be divided equally among all the Roman Catholic Churches of Nashville.

All of her kinspeople predeceased her and she left no relatives by blood or marriage, except her surviving husband, Neal Hamblin, and her stepson, Ernest Hamblin. Neal Hamblin was married twice. Ernest Hamblin was his son by his first marriage. His first wife died at the time Ernest was about six years of age. About two years later, or on September 15, 1906, Neal Hamblin married Julia Sunday. At this time he was employed by the Nashville, Chattanooga & St. Louis Railway and she was working. She ceased working upon her marriage, and thereafter for twenty-nine years, or until her death, September 15, 1935, she lived in the home with her husband and stepson and was supported by them. They were all members of the Catholic Church, and lived together very harmoniously. It is undisputed that the relationship between the husband and wife was one of mutual affection and great tenderness, as was that between the stepmother and stepson. He was devoted to her as to his own mother and she was as fond of him as if he had

been her own child. In 1917 Neal Hamblin bought and paid for the home place, having the title to the property conveyed equally to his wife and son.

About a year after the marriage of Neal Hamblin and Julia Sunday, her brother, Henry Sunday, who was her last surviving relative by blood, and who was himself a bachelor, came to make his home with the Hamblins. Henry Sunday was employed by the L. & N. Railroad Company. He paid Julia Hamblin $5 a week for his board and lodging. He continued to live with the Hamblins until his death on May 1, 1928. On July 2, 1923, Julia Sunday Hamblin made a will, written wholly in her own handwriting, by which she gave the Church of the Assumption $350, of which $100 was for masses to be said for her soul, $100 for masses to be said for the deceased members of her family, $150 for pew rent and school money. She gave $100 to the nurse who should nurse her during her illness. All the rest of her estate, real and personal, she directed to be divided equally among her husband, her brother, and her stepson. At this time it appears that the only property she had was a one-half undivided interest in the home place, and a savings account in the North Nashville Branch of the First Savings Bank & Trust Company, of $1,896.87. Mrs. Hamblin and her brother were very devoted to each other. On the 5th day of May, 1923, he made a will giving all his property to his sister and naming her his executrix without bond. On May 1, 1928, he died. The net amount of his estate was about $19,000, which was all personalty.

Twenty-five laymen or nonexpert witnesses testified that in their opinion Mrs. Hamblin was of unsound mind from 1926 on until her death. She was treated at Stevens or the City View Sanitarium from May 13, to May 20, 1930, and at Madison Sanitarium during the week ending June 2, 1930, both of which are institutions where nervous and mental disorders are treated. She was sent to the Davidson County Asylum for the Insane on March 24, 1931, where she remained for about nine weeks, after which she was discharged and her husband and stepson were allowed to take her back home, where she remained until her death.

However, during this period from 1926 until her death, she did many things which a sane, normal person ordinarily does. She administered on her brother's estate, continued to keep the lock box which he had had at the bank, continued in her name as executrix the savings account which he had had at the bank, continued her own savings account, from time to time made withdrawals from, and deposits in, her account, gave checks to pay her bills at Stevens. and at Madison Sanitariums, and generally managed her own affairs.

While testifying that in his opinion Mrs. Hamblin had been of unsound mind during this time, Neal Hamblin admitted that he

had permitted her to do these things without interference or objection on his part. In the proceedings for the commitment of Mrs. Hamblin to the Davidson County Asylum for the Insane (March 24, 1931), he stated that "her insanity is of less than two years duration." It is insisted that by reason of these matters he is estopped to contest the will upon the ground that she was of unsound mind. And Ernest Hamblin during this period had certain transactions with her which, it is claimed, work an estoppel upon him. There was introduced in evidence a note dated September 15, 1930, due two years or before from date, payable to Julia Hamblin, in the sum of $2,000, executed by Ernest Hamblin, and another note dated March 16, 1931, due sixty days after date, payable to the order of the Commerce-Union Bank, in the sum of $500, signed by Ernest Hamblin and Julia Hamblin. His explanation of this transaction is that he had a lot and a building thereon in which he conducted a tin shop; that he had given a mortgage on this property for $1,500, which was about to be foreclosed; that he borrowed $1,500 from his stepmother to take care of this mortgage; that he got her to sign the $500 note as surety for him to enable him to borrow that amount from the Commerce-Union Bank; that she paid this note for him on June 11, 1931; and that, in satisfaction of his indebtedness of $2,000 to her, he made deeds to her conveying his one-half interest in the home place and the property on which the tin shop was located; that this property was worth considerably more than the amount of the indebtedness; and that he took no advantage of her, she lost nothing, but the transaction was rather to her advantage.

Proponent insists that Neal Hamblin and Ernest Hamblin, having dealt with Mrs. Hamblin and held her out as a person of sound mind, are estopped now to assume an inconsistent position and contest the will on the ground that she was not of sound mind. Contestants contend that they cannot be held estopped because no estoppel was pleaded and because no estoppel could arise from these transactions.

In order to rely on these matters as an estoppel, it was not necessary for the proponent specially to plead them. An estoppel in pais must be specially pleaded in a suit in equity, but not in an action at law. Boone v. Citizens' Bank & Trust Co., 154 Tenn., 241, 290 S. W., 39, 50 A. L. R. 1369; Carolina Insurance Co. of Wilmington, N. C. v. St. Charles, 20 Tenn. App., 342, 98 S. W. (2d), 1088. But in these matters we think there is nothing that can create an estoppel upon contestants or stand in the way of their right to contest this will. In case of intestacy, Neal Hamblin, as surviving husband, would take Mrs. Hamblin's personalty (Baker v. Dew, 133 Tenn., 126, 179 S. W., 645), and if the will of 1923 be valid, both contestants are legatees and devisees thereunder. In

694

any event, they have an interest in the estate, if the will of 1929 be denied probate; and this gives them the right to contest this will. Allred v. Allred, 5 Tenn. App., 200. Nor have they done anything to estop themselves to pursue this right. They have received no benefits and made no election to take under this will, nor have they induced the proponent or any other person to act to his injury or to change his position for the worse by reason of any representations or conduct on their part. Unless they had done one or the other of these things, there can be no estoppel in pais upon them to make this contest. Rogers v. Colville, 145 Tenn., 650, 238 S.W., 80; Fitch v. American Trust Co., 4 Tenn. App., 87. If they had received gifts from Mrs. Hamblin and, while still retaining them, sought to contest the will upon the ground that she was of unsound mind during the period when the gifts were made, so that their conduct would really amount to fraud, as the contestant's conduct did in Hutchins v. Hutchins, 48 App. D. C., 495, relied on by the proponent, they might properly be held estopped; but they have done nothing of this sort. Neal Hamblin is not shown to have received anything from his wife, and the uncontradicted proof is that the property Ernest Hamblin conveyed to her was worth more than the amount of money he borrowed from her. The unsworn statement of Neal Hamblin, made in the proceeding for the commitment of Mrs. Hamblin to the Davidson County Asylum for the Insane on March 24, 1931, that her insanity was of less than two years' duration, was explained as having been inadvertently made by him in signing the printed form containing this language without having read it or being aware of its being in the form. Under these circumstances, this statement cannot be held to have created a judicial estoppel upon him to contest the will upon the ground that Mrs. Hamblin was of unsound mind at the time it was made. Sartain v. Dixie Coal & Iron Co., 150 Tenn., 633, 647-654, 266 S. W., 313, and cases there cited.

The other question presented by the proponent's insistence that a verdict should have been directed for him, is whether there was any material evidence that Mrs. Hamblin, on March 19, 1929, the day she made the will, was of unsound mind, within the sense of the law which fixes the standard of testamentary capacity. This standard is that the testator must be of sound and disposing mind and memory, which is such mind and memory as enables him to know and understand the business in which he is engaged at the time of making his will, i. e., to recollect the property which he is about to dispose of, the manner of distributing it, and the objects of his bounty, and to comprehend and appreciate the claims to which he ought to give effect. Bridges v. Agee, 15 Tenn. App., 351, 355, 356; Sizer's Pritchard on Wills, sections 99-102, and cases there cited. Mere physical weakness, or disease, old age, eccen-

tricities, blunted perception, weakening judgment, failing mind or memory, are not necessarily inconsistent with testamentary capacity, but are facts to be considered in determining whether such capacity existed. One may be capable of making a will and yet incapable of making a contract. Sizer's Pritchard on Wills, section 100, and cases there cited. Capacity to acquire and preserve property is evidence of testamentary capacity, but not conclusive. Gass' Heirs v. Gass' Ex'rs, 3 Humph. 278, 22 Tenn., 278, 285.

The testator's mental condition at the very time of executing the will is the only point of inquiry; but to enable the triers of the facts to ascertain this condition at that time, evidence of the testator's mental and physical condition before and after making the will, within reasonable limits, is received. His appearance, conduct, conversation, declarations, any well-marked change of character or habits without sufficient cause, the existence of insanity in blood relations, or any other particular fact or facts from which the condition of the testator's mind at the time of the making of the will may be inferred, are competent on the question of testamentary capacity. Bridges v. Agee, 15 Tenn. App., 351, 355, 356, and cases there cited; Sizer's Pritchard on Wills, section 111, p. 137; see Note in 68 A. L. R., pages 1311-1315. While nonprofessional or lay witnesses, after stating the facts on which their opinions as to the testator's sanity or insanity are founded, are allowed to give such opinions in evidence, these opinions themselves, apart from the facts and circumstances on which they are based, are not evidence; and a verdict may be directed in favor of the will even where such witnesses have testified that in their opinion the testator was of unsound mind, unless facts and circumstances have been put in evidence which are sufficient to warrant the inference or conclusion that the testator was not of sound mind. Fitch v. American Trust Co., 4 Tenn. App., 87, 95, 101, 102, and cases there cited. In determining whether proponent's motion for a directed verdict in the present case should have been sustained, we are required to take as true the evidence supporting the right of the contestants, construe it most strongly in their favor, and discard all countervailing evidence, and if there is then any doubt as to the conclusion or inference to be drawn from the whole evidence, the case must go to the jury. Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn., 551, 556, 249 S. W., 984; Provident Life & Accident Insurance Co. v. Prieto, 169 Tenn., 124, 136, 83 S. W. (2d), 251; Finchem v. Oman, 18 Tenn. App., 40, 72 S. W. (2d), 564. This rule governs in the trial of will contests as in other cases. Fitch v. American Trust Co., 4 Tenn. App., 87, 93, 94, and cases there cited; Taylor v. Taylor, 14 Tenn. App., 101, 108, 109, and cases there cited. As has been stated, there were twenty-five witnesses,

mostly friends, neighbors, and acquaintances of Mrs. Hamblin, who testified that from 1926 on until her death she was of unsound mind. Before giving their opinions, these witnesses detailed a great number of facts and circumstances upon which they had formed such opinions. Within the permissible limits of this opinion, we cannot review all this evidence in detail. We can but give a brief summary of the particular facts which it tended to prove.

Before 1926, Mrs. Hamblin was a large woman, weighing from 175 to 200 pounds, in good health, and of a jovial, happy disposition. In that year she was sixty-one years of age. About this time a marked change came over her. The cause or physical basis of it is not shown, there being no medical testimony, but its outward manifestations were proved by many lay witnesses. Her physical appearance changed, her weight fell off to 125 or 130 pounds, she became highly nervous, unable to sleep at night, became very morose and melancholy. These symptoms gradually grew more marked and her condition grew worse. She withdrew herself from her friends and acquaintances, kept the windows, blinds, and doors to her room closed, the room dark, and kept the door locked and barred with a large piece of wood, frequently expressing fear that some person or persons were going to kill her. She would sit in her room alone in the dark and rock constantly and rapidly in a rocking chair, frequently nearly all night. She would require her brother, Henry Sunday, and after this death her husband, to take long walks with her about the streets late at night and in the early morning hours, and would walk along crying, wringing her hands, talking to herself, or screaming hysterically. She had been formerly a very devout woman of chaste and refined speech, but she would now frequently be heard crying, cursing, and taking the name of the Lord in vain. After the death of her brother in May, 1928, she quit taking her meals with her husband and stepson, and refused to eat food that had been prepared in her home. She arranged with different ones among her neighbors to cook and bring her her meals to her room. She would frequently hide food at various places around in her bedroom. At times she would tell her neighbors and friends that she had lost all her money and would have to go to the poor house. She would sit up all night until 2, 3, or 4 o'clock in the morning, rocking in her chair, talking hysterically to herself, breaking out in violent oaths, and taking the name of the Lord in vain. She would frequently not know her neighbors and friends when she saw them on the street. A fear grew in her mind that her husband and stepson were going to put poison in her food. On one occasion when her stepson brought her some milk, she required him and a neighbor of theirs to go with her back to the grocery store and exchange the bottle, saying that she wanted to get one that had no poison in it. There was no basis in fact or

reason for any such fear because her husband and stepson were always exceedingly kind, patient, and affectionate towards her. On one occasion late at night she went to the room of her husband with a large poker and awakened him by threatening to do him bodily harm. Several of the witnesses said she had a wild, strange look in her eyes, and her neighbors became afraid of her. On several occasions she thought she saw strange men coming in and out of the house, which was wholly a delusion on her part. One night she said she believed she saw a man in the yard with a head that looked like a cannon ball and with boxing gloves on his fists, when there was no such person present. She was so highly nervous and hysterical that she could not remain quiet or stay at any place very long, and would frequently be heard in her room rapidly rocking in her chair, breaking out in violent oaths for a while and then engaging in prayer. Many instances of conduct, conversations, and things Mrs. Hamblin would do were detailed by the witnesses as the basis of their belief that she was of unsound mind during the period from 1926 until her death in 1935. Mrs. Lottie Hatfield, who had been a clerk in the probate department of the office of the county court clerk for twenty-eight years, and who saw Mrs. Hamblin on May 8, 1928, when she qualified as executrix of her brother's estate, on April 23, 1929, when the inventory was filed, and on November 3, 1930, when the estate was closed, described her manner and demeanor. Mrs. Hatfield stated that when Mrs. Hamblin came to make the inventory she was in such a nervous state that Mrs. Hatfield had to take her out of the clerk's office and upstairs on the fourth floor of the courthouse to wait on her; that she was unable to tell Mrs. Hatfield what property her brother had or to give her the information from which to make the inventory; that this property consisted of money in bank and bonds in the lock box; that she had to send Mrs. Hamblin to the bank to get the bank books and the bonds from the lock box and bring them to her on the fourth floor of the courthouse to enable her to make out the inventory for Mrs. Hamblin; that Mrs. Hamblin did go and get the bank books and bonds, the funeral bill, doctor's bill, hospital bill; and that from these Mrs. Hatfield herself made out the report. Mrs. Hatfield stated that Mrs. Hamblin "had a wild expression about her" and that "she was of unsound mind."

This evidence, we believe, was sufficient to warrant the inference by the jury that Mrs. Hamblin was a person of unsound mind both before and after March 19, 1929, the date on which she undertook to make a will. When insanity is shown to have existed before the execution of the will, the presumption of law is that the insanity continues, unless the malady or delusion under which the testator suffered was in its nature accidental and temporary, and the burden of showing testamentary capacity at the time of

the execution of the will is shifted to the proponent or person insisting upon the validity of the will. Bridges v. Agee, 15 Tenn. App., 351, 356, and cases there cited. And where the evidence leaves it doubtful whether or not sufficient capacity existed, the burden of removing the doubt is upon the proponent. Key v. Holloway, 7 Baxt. 575, 66 Tenn., 575; Sizer's Prichard on Wills, section 105, p. 129. So, the burden being on proponent to show the will was executed during a lucid interval, or when Mrs. Hamblin had testamentary capacity, he was not entitled to a directed verdict unless the proof he produced can be held, as a matter of law, to have established this.

The circumstances surrounding the writing of a will, what was then said and done by Mrs. Hamblin, what instructions were given by her to the draftsman, who, if anybody, was present besides her and the draftsman at the time the instructions were given, what was the manner, conduct, and demeanor of Mrs. Hamblin at this time, are all matters as to which there is no evidence in the record, due to the fact that the draftsman, Mr. Tyne, died before this case was tried in the circuit court and without his evidence having been preserved. His associate, Mr. Peebles, who was present at the time Mrs. Hamblin signed the will, and who signed it himself as an attesting witness, stated that his recollection of the whole thing was very hazy and indistinct, that he only saw her for four or five minutes, that he had never known or seen her before, and that he now had no independent recollection of her.

The fact that the attesting witnesses failed to observe anything in the manner or conversation of Mrs. Hamblin to indicate that she was of unsound mind does not necessarily establish that this was a lucid interval, or that she was not under the influence and effect of delusions. Although she appeared to be perfectly sane and rational at the time of the execution of the will, so as to convince the attesting witnesses that she was sane, "the jury could conclude reasonably from all the testimony, that there was back of all of it an insane condition leading her to make such a will." Bridges v. Agee, 15 Tenn. App., 351, 368. A lucid interval is not merely a cooler moment, an abandonment of pain or violence or of a higher state or torture, a mind relieved from excessive pressure, but an interval in which the mind, having thrown off the disease, has recovered from its general habit. A lucid interval is not the mere absence of the subject of the delusion from the mind. By a lucid interval is not meant a concealment of delusions, but their total absence, their nonexistence in all circumstances, and a recovery from the disease and subsequent relapse. Attorney General v. Parnther, 3 Bro. C. C. (Belt) 444; Waring v. Waring, 6 Moo. P. C., 354; 12 Jur. 947, 948, 952; Banks v. Goodfellow, L. R. 5 Q. B., 549; also reported in 8 Am. Rep. 185-195.

But it is insisted that even though Mrs. Hamblin may have been insane at times on some subjects and suffered from a delusion or delusions, this would not invalidate her will, unless it was the product of such delusion or delusions; that the will itself shows that it was a perfectly sane and natural one and was not the product of any delusion or delusions; that if Mrs. Hamblin had been under a delusion that Neal Hamblin or Ernest Hamblin meant to kill or harm her, or any other delusion operating to their prejudice, she would not have given Neal Hamblin the $2,000 and Ernest Hamblin the home place, but would have left them out altogether. While the will itself may be. looked to as evidence of sanity or insanity on the part of the testator, and a just and rational will is evidence of a testator's sanity, and an inofficious will, that is one in which natural affection and the ties of near relationship have been disregarded, is evidence that the testator was of unsound mind or acted under a delusion, these things are not conclusive, but are matters for the jury to consider along with all other circumstances. Banks v. Goodfellow, supra; Sizer's Pritchard on Wills, section 113; Skinner v. Farquharson, 32 Canada Sup. Ct. Rep. 38, 73-80, 81-93.

When Mrs. Hamblin made the 1923 will, her estate was of the value of about $2,700. She gave to the Church $350 and to her nurse $100, or $450 altogether, which was about one-tixth of her estate. She gave the rest or about five-sixths of her estate equally to her husband, brother, and stepson. When she made the 1929 will, her estate amounted to $20,000 or $21,000. She gave about $16,000, or nearly four-fifths of her entire estate, in religious or charitable bequests, and gave only one-fifth of her estate to her husband and stepson, who had cared for and supported her for the last twenty-nine years of her life, and to whom she was bound by natural affection and the ties of near relationship. During the period between 1923 and 1929, there had been no estrangement or change in the relation between Mrs. Hamblin on the one hand and her husband and stepson on the other; but there had been a great change in her testamentary plan. To what was this change attributable? We do not think the fact that she gave them something and did not leave them out altogether establishes that the disposition was not the product of, or influenced by, a delusion, delusions, or an unsound mental condition. As we understand the authorities, the rule is that if a delusion was calculated to exercise any influence on the particular disposition made, or if it is doubtful whether it exercised such influence, then the question whether in fact it did, is one for the jury. Banks v. Goodfellow, supra; Sizer's Pritchard on Wills, section 113.

For the foregoing reasons, we think the question of whether Mrs. Hamblin was of unsound mind at the time of the execution of the

will was properly submitted to the jury, and it was not error for the trial court to refuse to direct a verdict in favor of the proponent.

The proponent insists that it was error to admit evidence as to the lunacy commitment of Mrs. Hamblin to the Davidson County Asylum for the Insane, and insists that the court should have stricken such evidence. We think there is no merit in this insistence. Neal Hamblin had testified without objection as to the fact of Mrs. Hamblin's commitment. The proponent, through his counsel, sought to cross-examine him as to the statement he had made in the commitment papers to the effect that Mrs. Hamblin's insanity had been of less than two years' duration. This mode of cross-examination was objected to by contestants' counsel, upon the ground that the commitment papers themselves were the best evidence, wherefore proponent through his counsel stated in open court that he would put in these papers as a part of his own case. Afterwards when a copy of the paper was introduced, no objection was then made. We think Mrs. Hamblin's commitment was a relevant circumstance, and was admissible on the issue of her mental unsoundness, even though such commitment was subsequent to the date of the execution of the will. Sizer's Pritchard on Wills, section 111, and cases there cited; Note, 68 A. L. R. 1311-1315. Proponent insists that it was error to allow the witness Partain, who was an employee at the county asylum, to testify as to Mrs. Hamblin's mental condition in 1931; and that it was error to allow C. F. Hill, a chiropractor, who treated Mrs. Hamblin in May, 1930, to testify as to her condition at that time. The objection, we understand, is that this testimony was too remote. We do not think so, because evidence as to a testator's mental condition before and after the making of the will, within reasonable limits, is admissible; and we do not think the testimony complained of was too remote in this case. Bridges v. Agee, 15 Tenn. App., 351, 355, 356, and cases there cited; Note, 68 A. L. R. 1311-1315.

Proponent insists that it was error for the court to refuse to charge his special request No. 14, instructing the jury not to consider the evidence as to Mrs. Hamblin's commitment. What we have just said above equally applies to this assignment and it is overruled.

Proponent complains of the refusal of the trial judge to give the jury his special request No. 4, which undertook to sum up some inconsistencies in the testimony of Neal Hamblin, and to instruct the jury that "these contradicted statements destroyed the value of the evidence of the opinion of said Neal Hamblin as to the unsoundness of mind of Mrs. Julia Hamblin on March 19, 1929." And proponent makes a similar complaint upon the refusal of the trial judge to give to the jury proponent's request No. 3, which

made a similar treatment of the testimony of Ernest Hamblin, requesting a similar instruction to the jury to the effect that such testimony has been destroyed. We think the trial judge properly declined both of these requests. To have granted them would have been to invade the province of the jury. Tennessee Central Railroad Co. v. Morgan, 132 Tenn., 1, 19-21, 175 S. W., 1148.

Proponent insists that the trial judge erred in charging the jury as follows:

"It is essential to the exercise of testamentary capacity that the testator shall understand the nature of the act and its effects, the extent of the property of which such testator is disposing, and shall be able to comprehend and appreciate the claims to which the testator shall give effect, and that no disorder of the mind shall poison the testator's affections, or pervert a sense of right, or prevent the exercise of natural faculties, that no insane delusion shall influence the mind in making disposition of the testator's property and bring about a disposal of it which, if the mind had been sound, would not have been made. If the human instincts and affections or the moral sense become perverted by mental disease or some insane suspicion or aversion take the place of natural affection, and if reason and judgment are lost and the mind becomes a prey to insane delusions calculated to interfere with and disturb its functions and lead to a testamentary disposition due only to the baneful influence of the insane delusions, in such case a testamentary power to make a valid will and testament does not exist. However, if and when it appears that a delusion has not affected the general faculties of the mind and has had no effect upon the making of the will, the testator may then, nevertheless, have the mental capacity to make a will."

"Now, gentlemen, as a part of my original charge I will charge you on the proposition of insane delusions:"

" 'A person is possessed of a delusion—that is, an insane delusion—when he conceives something extravagant or unreasonable to exist which has no existence except in his own abnormal imagination, but having once conceived the thing or condition to exist, it is impossible to reason him out of it.' "

To support this insistence, proponent says that there was no evidence that the will was the product of an insane delusion and no basis in the evidence for the foregoing instruction. We have hereinabove stated our view that there was evidence sufficient to warrant an inference by the jury that the will was the product of an insane delusion. The language of the portion of the charge above complained of is substantially the language of pages 124, 125 of Sizer's Pritchard on Wills, which is based on the holding in Banks v. Goodfellow, L. R. 5 Q. B. 549. We think there is no merit in this insistence of proponent.

Proponent complains of the actions of the trial judge in refusing his request No. 1, which was to the effect that the jury should direct their minds to the precise time of the execution of the will, and that if the testatrix was then of sound mind, the fact that she might have been of unsound mind at other times was wholly immaterial. It was not error to refuse to grant this request, because the matter had been sufficiently covered in the general charge to the jury.

The proponent complains of the trial judge's refusal to give his request No. 5, which instructed the jury that the testimony of the subscribing witnesses should be given careful consideration because of their opportunity for observing the testatrix' mental condition at the time of making the will. It is not pointed out why the refusal of the trial judge to grant this request was error. We think it was not. Upon this point the general charge was full and adequate.

Proponent complains of the refusal of the trial judge to charge his special request No. 6, which would have instructed the jury that if the testatrix was of sound mind they should find for the will, "regardless of the opinion of the jurors as to the rightfulness or wrongfulness of the disposition made by Mrs. Hamblin of her property in the alleged will." This request was to the same effect as proponent's request No. 2 which had been given by the judge to the jury. For this reason, the judge's refusal to give request No. 6 was not error.

Proponent assigns for error the refusal of the trial judge to give to the jury his request No. 9, as follows:

"I further charge you that the correct test as to whether or not the alleged testatrix, Mrs. Hamblin, had sufficient mental capacity on March 19, 1929, to make a valid will is: was she capable on that date of recollecting the property she was about to bequeath, the manner of distributing it, and the objects of her bounty? In other words, were her mind and memory on that date sufficiently sound to enable her to know and to understand what she was doing at the time she executed her alleged will?"

It is not pointed out why the court's failure to give this request was error, or how it prejudiced proponent. The general charge to the jury was full and adequate upon this point.

Proponent assigns as error the refusal of the trial judge to give to the jury his request No. 10, as follows:

"I further charge you that if the jury should find from all the evidence in this case that on March 19, 1929, the testatrix, Mrs. Hamblin, was subject to nervousness, eccentricities, or singularities, however great, that fact in itself would not be sufficient to invalidate her alleged will, and such facts should not be confounded by the jury with insanity or lack of mental capacity to execute a valid

will. In spite of such nervousness, eccentricity, or singularity, if proven, the sole test of testamentary capacity is, whether or not on March 19, 1929, Mrs. Hamblin was capable of recollecting the property she was about to bequeath, the manner of distributing it, and the objects of her bounty.''

We think this assignment is without merit because the point had been fully and adequately covered in the general charge.

The proponent assigned as error the refusal of the trial judge to charge his request No. 13, which was as follows:

''I further charge you that the burden of proving the formal execution of the will rests on the proponents, but when this has been done by producing the will and proving its execution by the surviving attesting witness, then the presumption of law is in favor of the sanity of the testator and the burden of overcoming this legal presumption of sanity or capacity is upon the party seeking to contest the will.''

This matter had been fully covered in the general charge, and the trial judge's action in refusing to charge this request was not error.

Proponent assigns as error the refusal of the trial judge to charge his special request No. 15, which was as follows:

''I further charge you that this contest is based upon an allegation of mental unsoundness on the part of Mrs. Hamblin at the time she executed her alleged will on March 19, 1929. There is no allegation of undue influence on the part of any one exercised upon or affecting Mrs. Hamblin in executing her alleged will. Consequently, the Court instructs you that you will not consider any evidence or any inference drawn from any evidence in so far as it tends to prove or disprove any such undue influence or alleged undue influence.''

It is not shown how the court's refusal to give this request was erroneous. The matter had been fully covered in the general charge.

Proponent assigns as error the trial court's refusal to charge his request No. 16, which was as follows:

''I further charge you that testimony as to the ability or inability of the testatrix to handle her personal business before and after said date, is competent and should be considered by the jury in arriving at a verdict as to the soundness or unsoundness of her mind on March 19, 1929, the date on which the alleged will was executed.''

The refusal to grant this request was not error, because its subject matter had been fully and adequately covered in the general charge.

It results that we find no error in the judgment below, all of proponent's assignments of error are overruled, and the judgment of the circut court is affirmed. The costs of this appeal in error will

be adjudged against the plaintiff in error and the sureties on his appeal bond. The cause will be remanded to the circuit court in order that the verdict and judgment may be certified to the county court, to be entered of record.

Faw, P. J., and Crownover, J., concur.

## On Petition for Additional Finding of Facts and for a Rehearing.

FELTS, J. On a former day of the term we affirmed the judgment of the circuit court in this case. Plaintiff in error, John Melody, executor, has filed a petition asking the court (1) to find as facts certain matters of evidence set out in twenty-eight numbered paragraphs of the petition, and seeking (2) a rehearing upon our holding that the contestants, Neal Hamblin and Ernest Hamblin, were not estopped to contest the validity of the paper writing offered by the proponent as the will of Julia Sunday Hamblin.

(1) The statute, Code, section 10620, requiring this court to make written findings of fact, contemplates that the court shall find only the ultimate, determinative facts, and not mere matters of evidence. Badger v. Boyd, 16 Tenn. App., 629, 645, 65 S. W. (2d), 601; Julian v. American National Bank, Tenn. App., 106 S. W. (2d), 871, 887. By its terms this statute applies only to "cases tried on the facts in a chancery court," and not to cases where there has been a trial by jury in the circuit court; and in the latter sort of cases it is the province of this court not to make findings of fact, but merely to determine whether there is any material evidence to take the case to the jury or to support the verdict, as the question may be. DeKalb County v. Tennessee Electric Power Co., 17 Tenn. App., 343, 353, 67 S. W. (2d), 555; Whitehurst v. Howell, 20 Tenn. App., 314, 329, 98 S. W. (2d), 1071.

(2) Petitioner states that the conduct of contestants was never relied on by him as constituting an estoppel in pais against their right to contest the will; and he quotes from his supplemental brief as follows:

"This is not a case of a technical estoppel, but is based upon the broad proposition that the contestants by their conduct and dealings with the testatrix in her lifetime are now concluded and precluded from asserting the contrary. They cannot blow hot and cold."

In our former opinion we considered whether contestants' conduct constituted either an estoppel in pais or a judicial estoppel, and concluded it could constitute neither. Can conduct which is insufficient to constitute an estoppel be given all the effect of an estoppel under some other name? We know of no principle of law by which this may be done, and petitioner points out none.

The petition makes no new argument, cites no new authority, and points out no material fact as overlooked, and, therefore, should be denied. Badger v. Boyd, 16 Tenn. App., 629, 645, 65 S. W. (2d), 601; Louisville & N. R. R. Co. v. U. S. Fidelity & Guaranty Co., 125 Tenn., 658, 691-693, 148 S. W., 671; see 167 Tenn., 702, 703.

For these reasons the petition is denied and dismissed at petitioner's cost.

Faw, P. J., and Crownover, J., concur.