IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 19, 2000 Session

**In Re ESTATE OF W.O. McINTYRE, DECEASED, MIKE BROWDER, ADMINISTRATOR, C.T.A.**

**TERESA BURNS and STACEY KEITH McINTYRE v. JANE McINTYRE AND MIKE BROWDER**

**Direct Appeal from the Chancery Court for McNairy County**
**No. P-303    Dewey C. Whitenton, Chancellor**

---

**No. W1999-01700-COA-R3-CV - Filed November 7, 2000**

---

This is a will contest. The decedent committed suicide after writing several notes in which he expressed his wish that the bulk of his estate pass to his wife of eighteen years, with specific bequests to his children. The decedent's children contested the validity of the disposition, arguing that the decedent lacked testamentary capacity to execute a will at the time that he wrote the notes. After a jury trial, the jury found that the decedent had testamentary capacity and that the handwritten notes constituted a valid holographic will. The children appeal, arguing that the burden of proving testamentary capacity should have been placed on the will's proponents, due to the decedent's depression and resulting suicide, and that the evidence did not support the jury's verdict. We affirm, finding that the trial court did not err in its instructions on the burden of proof and that there is material evidence to support the jury's verdict.

**Tenn. R. App. P. 3; Judgment of the Chancery Court is Affirmed.**

HOLLY KIRBY LILLARD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Terry L. Wood, Corinth, Mississippi, for the Appellants, Teresa Burns and Stacey Keith McIntyre.

Terry Abernathy, Selmer, Tennessee, for the Appellees, Jane McIntyre and Mike Browder.

**OPINION**

This is a tragic case involving the contest of a holographic will. On April 28, 1996, fifty-six-year-old W.O. McIntyre ("McIntyre") committed suicide. He was survived by his wife of eighteen years, Jane McIntyre ("Mrs. McIntyre"), and two grown children from a previous marriage, daughter

Teresa Burns ("Teresa") and son Stacey Keith McIntyre ("Keith"). Prior to his death, McIntyre was in a state of extreme depression, stemming in part from his relatively recent diagnosis of diabetes, and the resulting fear that his health would worsen and leave him a burden to his family.

Prior to McIntyre's death, he wrote three handwritten suicides notes. The notes, dated March 3, March 13, and April 27, 1996, were entitled "W. O. McIntyre Last Wishes Will and Notes." In them, McIntyre expressed his wish that everything he owned go to his widow, with the exception of a $25,000 bequest each to his son and daughter. Mrs. McIntyre offered the notes to the probate court as her husband's holographic will.

On June 6, 1996, an order was issued admitting the holographic will to probate, and appointing Mike Browder ("Browder"), McIntyre's nephew, as administrator of the estate. On September 10, 1996, McIntyre's grown children, Teresa and Keith ("Contestants") filed a lawsuit to contest the will against Mrs. McIntyre and Browder ("Proponents"). In the lawsuit, they asserted that their father was incompetent to make a valid will at the time he wrote the suicide notes. The Proponents filed an answer denying that the decedent lacked testamentary capacity.

Trial was held before a jury on March 23 and 24, 1998. Mrs. McIntyre testified that the document which had been tendered to the probate court as her husband's last will and testament consisted of three notes written on three separate dates. Her husband had shown her the first note shortly after he wrote it on March 3, 1996. She found the second note on the morning of March 14, 1996. At her husband's request, she placed the first two notes in the top drawer of their bedroom chest of drawers. The last note was left by her husband on the dining room table on the day that he committed suicide. She testified that she was positive that the three notes were entirely in McIntyre's handwriting.

Mrs. McIntyre testified that her husband had been diagnosed with diabetes a couple of years before his death, and that the diagnosis upset him considerably. Although his diabetes could be controlled by pills, McIntyre worried about eventually becoming an invalid. Mrs. McIntyre testified that in the six months or so preceding her husband's suicide, his behavior changed remarkably. She said that he began to sleep a lot during the day, spend less time with his family, and was not as physically active as he previously had been.

Mrs. McIntyre testified that on March 1, 1996, McIntyre came home early from his job as a river boat captain because he was so depressed that he felt incapable of captaining the boat. At his employer's insistence, McIntyre talked to a counselor, Linda Laney ("Laney"), about his depression. He met with Laney twice, on March 7, 1996, and again on March 8, 1996. On March 13, 1996, Mrs. McIntyre met with Laney and told her that she was afraid to leave her husband alone, for fear that he would commit suicide. Laney recommended that McIntyre be hospitalized for treatment of his depression, and she scheduled an "intervention" for the next morning, March 14. On the morning of the intervention, Mrs. McIntyre found McIntyre's second suicide note, dated March 13, 1996. McIntyre was hospitalized later that day.

Shortly after he was released from the hospital, McIntyre returned to work. He had requested, and received, a demotion from captain to pilot. However, on Friday, April 26, he again left the boat early to return home. Mrs. McIntyre testified that McIntyre committed suicide on Sunday, April 28, while she was away from home. When she came home that day, she found the last suicide note, dated Saturday, April 27. In her testimony, Mrs. McIntyre expressed her opinion that McIntyre, although clearly depressed, was of sound mind when he wrote the three suicide notes.

Browder, McIntyre's nephew and the administrator of his estate, testified that he was familiar with his uncle's handwriting and that the holographic will was written entirely in his uncle's handwriting. Browder investigated McIntyre's assets and found they were essentially the same as those listed in the notes. Upon request, Browder read the notes aloud to the jury.

The second note began at the end of the first note, on the same paper. The first two notes, together, read:

Sunday March 3rd 96

W.O. McIntyre   Last Wishes Will + Notes

To All that I Leave Behind

Dieing [sic] is part of living and it comes to us one and all. To me it is not such a big deal. and to me in my present state of mind it would be a releif [sic]. I have talked and told Jane all about it and it is a heavy Burden almost more than I can bear. To those that I leave behind do not greive [sic] for me because if I am no more I am releived [sic] of my pain and mental anguish + turmoil.

As all of you know I am a diabetic and there is no cure for that only control. Also I have seen other people get old and become invalids + not be able to take care of themselves–and be dependant on family–hospitals–nursing homes and I do not want that for myself. and Also the expenses of a serious sickness. can completely wipe out a family's money. + savings.

Teresa and Family–Keith and Family

I have been having suicidal thoughts and if I do this (take my own life) I want Jane to have everything that I leave behind. Because she is the one that will be affected and hurt the most. And has been a dear + understanding partner in life. Also she will need it all–to continue her life and if there is any left at her time of passing. I want you all to have your share. Please be good to Jane + help her any way that you can.

To all the rest of my family
Lorena + Bobby + Sherry + Christie
Mike + Janet + kids
Marie + Shawn. Vicky–Ricky

-3-

When you think of me think of our past good years and the good times that we all had in years past.  I do when I reflect back.

Mike a note to you.   You have been one of the best relatives as a friend + as a person–truthful–honest–and dependable as anyone can be.  You have helped me immensely in the sale of items and I hope that I always made it worth your while.  I hope that you will continue to be that kind of a person.  It is a great asset as there are not a lot of people like you that I know.

Jane my Dearest wife   I love you and am so sorry for even thinking these thoughts much less doing them.  If my body is found + I'm sure it will be please have my remains cremated and no funeral.  I want no one to feel sorry or bear remorse for me–A few will–you the most—and let life go on as if I were on the boat.

March 13th 96–Jane I have given this constant thought and there seems like there is no way out–no releif [sic] other than to go on to the maker.  I am so very sorry that my life ended this way.  Please let your life go on + do not greive [sic] too much for me.  It seems like it was the only thing that I could do to end my personal hurt.

Jane our investments with H.J. Maxedon are as follows 8 of them.

1. Investment Company of America          27,781.00
2. Income Fund of America                 13, 419.
3. AMCAP Fund                             15, 061.
4. R.I.C. Reality Investment Co.          5, 000.
5. New Economy Fund                       38, 404.
6. Smallcap World Fund                    38, 094.
7. Europacific Growth Fund                35, 228
8. Delta Life + Annuity Company           55, 345.58
                              Total       228, 332.58

Jane, our investments with Little A Aron Forsyth he works now or did take over his dads business at Forsyth motors + used car cases in Corinth there across from Wrotens Hardware ( + his sister–her last name is Morris)

W.O. McIntyre Pioneer II Account No. 002-0964062547
        Latest Ammount [sic] shown on paperwork       77, 110.44
WOMC Pioneer II (IRA) Account No. 002-9200326488
        Latest Ammount [sic] shown on paperwork       16, 596.14
Jane McIntyre Pioneer II (IRA)
        Latest Ammount [sic] shown on paperwork       16, 467.53
W.O. + Mary Jane McIntyre–American Capital Comstock Fund A
        $ Ammount [sic]                               9, 519.28
          Appx Total                                  119, 692.00

Also Jane there is a company 401 K plan which ammounts [sic]according to the last paperwork                     16, 975.33

Savings Bonds in a safety deposit box in Selmer + some in the green metal box here at home which should ammount [sic] to 25 or 30, 000      $25, 000

| | | | |
|---|---|---|---|
| Also $60, 000 plus in the bank | | | 60, 000.00 |
| Totals | | H.J. | 228 332.00 |
| Aron Forsyth + sister (?) Morris | | | 119 692 |
| Company 401 K plan | | | 16 975 |
| Savings Bonds Estimated | | | 25, 000 |
| Total Estimated Monies | | | 449, 999. 00 |

Jane I love you and am so very sorry for what I have done–But the dollar did not make me happy.  Please use the monies + possessions that I leave behind wisely. + maby [sic] it will carry you through.

Please tell Raymond Hopkins Royce Wilkins + Martha Floyd that they are good people + good friends and that my thoughts of them were the very best.

Teresa Clay + Ricky   I love all of you very much and am so glad that you are doing well.  I hope you won't miss me much. –Life goes on no matter what happens. And I know that you will make the best of it.  I am leaving everything to Jane because she will be hurt the worst and will need just about all to continue her life. Stay in Church and beleive [sic] and as you know things will go better.

Keith + Laurie–I love you also and am very proud of you.  Keep up the good work and I wish you a healthy boy or girl.  Remember me in my better days.

To all Relatives Friends.  Please do no greive [sic] or feel sorry for me.  I feel like I will be out of my misery + troubles.  Good by to all + remember me in my younger + better days.

And last to Jane–I love you with all my heart.  I do not know what has happened to me other than I dread daylight ever [sic] day + seeing the sun come up for another day.  So therefore life is not a pleasure for me and it cannot be for you. I beleive [sic] that I will be forgiven for taking my own life and will see you in heaven.  I do not believe it is God's will that a person should suffer like I have recently.  Please forgive me for what I have done and think of our good years together.

> I love you Jane
> Always have +
> Always will.
> (s) W.O. McIntyre

The last note, dated April 27, 1996, reads:

> I hope you saved my other notes + wishes–I can't find them.

Sat April 27th 96–Jane things did not get better this trip.  I got off the boat in St. Paul because I had lost my nerve, did not have any confidence in my ability to handle (drive) the boat.

It seems like that I am deeper in this black hole, and no hope of ever coming

out. And I just can't take it. If there was a way that I change things + make them better I would beleive [sic] me.

Please give or see that Teresa + Keith get $25,000 a piece of my savings + investments   I have always wanted them to have something when my life was over. Jane I love you so much + really am sorry   I know of no other way.

You and all remember my better years.  I know that no one can understand this I don't myself.  but it is bigger than me.

> Bye Bye To All
> And Please Forgive me
> (s) W.O. McIntyre

After reading the notes, Browder acknowledged that McIntyre's personality had changed in the last six months of his life, and that he was less active and spent less time with his grandson, Clay. However, he did not believe that his uncle was mentally ill.

At the conclusion of Browder's testimony, the Proponents moved the court to find that due execution of the will had been proven, and that, consequently, the burden of proof shifted to Contestants to show that McIntyre lacked testamentary capacity when he executed the will. The Contestants argued that the burden to prove testamentary capacity remained on the will's Proponents because of "suspicious circumstances" surrounding the execution of the will, namely that it consisted solely of the testator's suicide notes. The trial court ruled that the Proponents had satisfied their burden of proving due execution of the will, and that the burden then shifted to the children to show that their father lacked testamentary capacity at the time he executed the will.

The Contestants then presented testimony regarding McIntyre's testamentary capacity. McIntyre's grown children, Teresa Burns and Keith McIntyre, indicated that McIntyre had been a vibrant, energetic man, but that his personality dramatically changed in the six months prior to his death. Teresa testified that, in the six months prior to his suicide, McIntyre was frequently unclean, unshaven and sloppily dressed, and that she often found him asleep in the middle of the day. Referring to McIntyre's hospitalization for depression, Teresa testified that her father probably tried to "fake his way out" by pretending his mental state had improved. Keith testified that, after McIntyre was released from the hospital, he was uncharacteristically emotional and physically affectionate. Both Teresa and Keith acknowledged that McIntyre continued to appear aware of what he owned and continued to know close family members and friends. Keith acknowledged that his father and stepmother had a good relationship. However, Teresa maintained that McIntyre was not of sound mind when he wrote the suicide notes that served as his will.

Linda Laney testified about her counseling with McIntyre.  She said that she saw McIntyre twice, several days before he was hospitalized.  She testified that, although McIntyre was "deeply depressed," he was oriented as to time and place, recognized Laney, and knew who his wife, children and other family members were.

Paul King, M.D. ("Dr. King") testified by deposition that he treated McIntyre during his hospitalization. He diagnosed McIntyre as suffering from "major depression without psychotic features." Dr. King said that McIntyre's belief that his diabetes was "terrible" was an "irrational feeling" but not a delusion. He testified that the suicide notes were the result of McIntyre's "irrational feelings" about his diabetes, combined with "rational thinking" about his family and the manner in which he wanted his estate divided. Dr. King stated that McIntyre remained oriented as to time, place and person, did not become out of touch with reality, and showed no signs of being psychotic.

Another psychiatrist, Catherine Morton Greene, M.D. ("Dr. Greene") testified about McIntyre's mental state after reviewing his medical records, Linda Laney's records, and the suicide notes. Dr. Greene felt that McIntyre was having "irrational thoughts and feelings" when he wrote the suicide notes. Dr. Greene said that McIntyre's feelings of hopelessness about his rather mild case of diabetes demonstrated that he was, to a degree, "out of touch with reality." She opined that the fact that McIntyre committed suicide demonstrated that he was not thinking rationally.

After deliberation, the jury found that McIntyre had been of sound and disposing mind and had sufficient mental capacity to make the will. Consequently, on March 30, 1998, the trial court entered an order finding that the holographic will "was valid in all respects," and confirming its previous probate. In response, Contestants filed a motion for a new trial. The trial court denied the motion on June 30, 1998. The Contestants now appeal the decision of the trial court.

On appeal, the Contestants argue that the trial court erred in refusing to place the burden of proving testamentary capacity on the will's Proponents, due to the "suspicious circumstances" surrounding the death of the decedent. They contend there was no material evidence supporting the jury's verdict that the decedent possessed a sound and disposing mind at the time he executed the will. The Contestants also argue that the trial court erred in its jury instructions, in permitting the Proponents' expert witness to testify about the decedent's capacity to make a will, in permitting the Proponents' expert witness to offer opinions not rendered to any degree of medical certainty, in allowing a letter from the Proponents' expert to be admitted into evidence, in refusing to allow the jury access to trial exhibits, and in permitting the Proponents to ask leading questions of their witness.

The Contestants first argue that the trial court erred by ruling that the burden was upon the Contestants to prove that McIntyre lacked testamentary capacity. They assert that McIntyre's will is suspect because it consists of suicide notes written while in a deep depression and under the influence of a delusional belief about his diabetes. They argue that these facts amount to "suspicious circumstances" surrounding the execution of McIntyre's will, and that consequently the burden to prove testamentary capacity remained on the will's proponents.

The trial court's ruling on the burden of proof in a will contest case is a conclusion of law, which we review *de novo*, with no presumption of correctness attached to the trial court's conclusion of law. *See Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993); *Zseltvay v.*

***Metropolitan Gov't of Nashville and Davidson County***, 986 S.W.2d 581, 584 (Tenn. Ct. App. 1998). A holographic will is one that is written in the testator's own hand. To be prima facie valid, "the signature and all its material provisions must be in the handwriting of the testator and his handwriting must be proved by two (2) witnesses." Tenn. Code Ann. § 32-1-105 (1984). In this case, the testimony was undisputed that the suicide notes were entirely in the handwriting of McIntyre and were signed by him.

Ordinarily, once due execution of a will has been proven, the burden shifts to the will's contestants to prove that the will is invalid due to fraud, lack of testamentary capacity, or undue influence. This Court has stated:

> In a will contest the initial burden is upon the proponent of the will to show its prima facie validity and this is a question for the determination of the court. Upon the proponent's satisfactorily showing prima facie validity, the burden shifts to the contestant and, generally, the burden is upon the contestant to show facts relied upon to void the will.

***Taliaferro v. Green***, 622 S.W.2d 829, 835 (Tenn. Ct. App. 1981), *overruled on other grounds by* ***Matlock v. Simpson***, 902 S.W.2d 384, 386 (Tenn. 1995). ***See also Harper v. Watkins***, 670 S.W.2d 611, 628 (Tenn. Ct. App. 1983). A testator is presumed to have the capacity to execute a will. ***Taliaferro***, 622 S.W.2d at 835. If the testator has previously been adjudicated insane, the burden to show testamentary capacity fall upon the will's proponents; in all other cases, the burden shifts to the will's contestants to show that the testator lacked testamentary capacity. ***Harper***, 670 S.W.2d at 628 (quoting ***Parham v. Walker***, 568 S.W.2d 622, 624 (Tenn. Ct. App. 1978)).

However, where "suspicious circumstances" are shown to have surrounded the execution of the will, that is, circumstances which raise doubts as to whether the testator understood the significance of his actions, the proponents have the burden of coming forward with evidence that the testator had the capacity to execute the will:

> The rules of burden of proof with regard to testamentary capacity are substantially similar to those with regard to undue influence. Ordinarily, there exists a presumption of testamentary capacity once the prima facie validity of the will is shown, but the existence of suspicious circumstances, once shown by the contestant, shifts the burden to the proponent to come forward with evidence that capacity existed, whereupon the issues go to the jury.

***Taliaferro***, 622 S.W.2d at 837 (citations omitted). The burden to show the existence of suspicious circumstances is always on the contestant in a will contest case. ***Keasler v. Estate of Keasler***, 973 S.W.2d 213, 217 (Tenn. Ct. App. 1997).

In this case, Contestants argue that McIntyre's delusional belief about the severity of his diabetes, the resulting suicide, and the fact that his will consists of suicide notes, amounted to

suspicious circumstances which placed the burden upon Proponents to produce evidence of McIntyre's capacity. In support of their argument, Contestants rely on *Goodall v. Crawford*, 611 S.W.2d 602 (Tenn. Ct. App. 1980) and *Burrow v. Lewis*, 142 S.W.2d 758 (Tenn. Ct. App. 1940).

In *Goodall*, the testator was an eighty-two year old man who had suffered a stroke which caused a degree of memory loss. The testator executed three different, mutually exclusive wills in a period of less than five years. *Goodall*, 611 S.W.2d at 602. The last will favored the son and daughter-in-law with whom the testator was living at that time. Under the last will, nothing was left to the testator's other children. Shortly after executing the will, the testator suffered another stroke and died. The children who had been excluded from the will filed a will contest lawsuit against the beneficiaries under the last will, arguing that their father lacked testamentary capacity and that the will was the product of undue influence. The jury found the will to be valid. On appeal, the contestants argued that the trial court had erroneously charged the jury on the burden of proof regarding undue influence and testamentary capacity. *Id.* at 604. The contestants argued that "under the circumstances of this case, the burden should have remained on the proponents to show that the testator had the requisite mental capacity and was free of undue influence when he executed his will." *Id.* The Court in *Goodall*, quoting *Burrow v. Lewis*, 142 S.W.2d 758 (Tenn. Ct. App. 1940), discussed the burden of proof in a will contest case:

> The issue here is between the general rule and an exception. The rule and the exception were discussed in *Burrow v. Lewis*, 24 Tenn. App. 253, 142 S.W.2d 758 (1940):
>
> > "Ordinarily, upon proof of the due execution of the will, it will be presumed that the testator knew and approved its contents; but where the circumstances are such as to excite suspicion, the burden of showing affirmatively that the testator fully understood and freely assented to its provisions is cast upon the proponents." 24 Tenn. App. at 259, 142 S.W.2d 758.
>
> In *Burrow v. Lewis*, the suspicious circumstances were these: A ninety year old blind man on his deathbed executed his will by making a mark which was out of the ordinary for him; an hour before he executed the will he failed to recognize his confidential business agent; the chief beneficiary under the will who had been acting as his nurse for two weeks arranged for the drafting of the will and assisted with the manual execution of the paper.

*Id.* at 604. The Court found that there were not sufficient suspicious circumstances in *Goodall* to warrant placing the burden to prove testamentary capacity and lack of undue influence on the will's proponents. *Id.*

In *Burrow v. Lewis*, the Court discussed examples of situations in which suspicious circumstances were found to exist, such as where:

the testator is aged, sick and infirm or unable to read and write by reason of blindness or illiteracy. In such cases it is held that proponent is onerated with the burden of showing that the testator comprehended the fact that he was about to execute his will and understood the contents of the paper. None of them hold that the burden of proving testamentary capacity rests upon proponent at any time or under any circumstances. Except when insanity is shown to have existed prior to the execution of the will this burden rests throughout the trial upon the contestant. . . . . The better practice is undoubtedly to maintain a clear distinction between the burden of proof upon the legal execution of the will in cases where, by reason of the peculiar facts appearing, the burden of showing a conscious execution of the will free from suspicious circumstances is placed upon the proponent and the general burden of establishing insanity and undue influence which, as we have seen, continues throughout the trial to rest upon contestants.

*Id.* at 763-64.

In *Curry v. Bridges*, 325 S.W.2d 87 (Tenn. Ct. App. 1959), the testator committed suicide shortly after execution of the will, and was found to have testamentary capacity. In *Curry*, the testator executed a will in which he established a trust in favor of Union University in Jackson, Tennessee. Forty-seven days later, he committed suicide by tightly sealing himself into a hand-made box in which he had rigged fire extinguishers to slowly release carbon dioxide gas. In the will contest case filed by the testator's relatives, the trial court granted a directed verdict to the will's proponents. This decision was appealed. After considering the circumstances, the Court of Appeals found that the testator "was fully capacitated at the time he made his will to understand what he was doing, to whom he wanted bequests and devises made, and the way and manner in which he wanted the trust administered." *Id.* at 111. It concluded that "the deliberation with which he went about the preparation of the way that he would take his life makes it clear and unmistakable that he knew the result of his act and knew what he wanted to do," and that "he died just like he wanted to die, aloof and alone." *Id.* Thus McIntyre's suicide, in and of itself, does not necessarily demonstrate lack of testamentary capacity. *See id.*; *See also In re Estate of Bonjean*, 413 N.E.2d 205, 208 (Ill. App. Ct. 1980)("The act of suicide, or attempted suicide, is not, per se, proof of insanity or insane delusions").

The Contestants contend, however, that even if McIntyre was generally competent, he suffered from an "insane delusion" regarding the severity of his diabetes, and that this delusion motivated his suicide and the creation of his will. A person is said to suffer from an insane delusion "'when he conceives something extravagant or unreasonable to exist which has no existence except in his own abnormal imagination, but having once conceived the thing or conditioned [sic] to exist, it is impossible to reason him out of it.'" *Helm v. Hayes*, No. 03A01-9710-PB-00497, 1998 WL 251766, at * 1 (Tenn. Ct. App. May 19, 1998)(quoting *Melody v. Hamblin*, 115 S.W.2d 237 (Tenn. Ct. App. 1937)). *See also In re Estate of Breeden*, 992 P.2d 1167, 1170 (Colo. 2000)(defining insane delusion as "'persistent belief in that which has no existence in fact, and which is adhered to against all the evidence'")(quoting *In re Cole's Estate*, 226 P.143, 145 (Colo. 1924)); *In re Estate*

*of Diaz*, 524 S.E.2d 219, 221 (Ga. 1999)(insane delusion is "a delusion having no foundation in fact and that springs from a diseased condition of mind"); *In re Estate of Weil*, 518 P.2d 995, 999 (Ariz. Ct. App. 1974)(insane delusion is "'the conception of a disordered mind which imagines facts to exist of which there is no evidence and the belief in which is adhered to against all evidence and argument to the contrary'")(quoting *Estate of Cook*, 159 P.2d 797, 802 (Ariz. 1945)). The will of a testator found to suffer from an insane delusion will not be held invalid, however, unless it is shown that his delusion materially affected the terms and provisions of his will. *Estate of Breeden*, 992 P.2d at 1171; *Estate of Weil*, 518 P.2d at 999.

At trial, both psychiatrists agreed that McIntyre's persistent belief about the severity of his diabetes was "irrational"; one labeled it a delusion, the other would not. Regardless, there was no evidence that McIntyre's belief about his diabetes materially affected the terms of his will. Rather, the contestants argue that it motivated the creation of the will. Under these circumstances, we find no error in the trial court's refusal to shift the burden of showing testamentary capacity from the will's Contestants to the Proponents.

The Contestants also argue that there was no material evidence to support the verdict of the jury. They assert that no reasonable jury could conclude that McIntyre was of sound mind at the time that he wrote the suicide notes.

Our review of this issue is governed by Tennessee Rule of Appellate Procedure 13(d), which states that "findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." This is a highly deferential standard of review, requiring us "to take the strongest legitimate view of the evidence in favor of the verdict, assume the truth of the evidence in support thereof, allow all reasonable inferences to sustain the verdict and disregard all to the contrary." *Johnson v. Cargill, Inc.*, 984 S.W.2d 233, 234 (Tenn. Ct. App. 1998)(citing *Hobson v. First State Bank*, 777 S.W.2d 24 (Tenn. Ct. App. 1989)). If there is any material evidence to support the jury's finding that McIntyre was of sound and disposing mind and memory at the time that he executed his will, the finding will not be disturbed on appeal. *See Bruster v. Etheridge*, 345 S.W.2d 692, 697 (Tenn. Ct. App. 1960).

A testator is deemed to have testamentary capacity if, at the time that he executes his will, he is able to know and understand the significance of his action. *In re Estate of Elam*, 738 S.W.2d 169, 171 (Tenn. 1987); *Keasler v. Estate of Keasler*, 973 S.W.2d 213, 219 (Tenn. Ct. App. 1997); *Harper v. Watkins*, 670 S.W.2d 611, 628 (Tenn. Ct. App. 1983). Generally, all that is required to show testamentary capacity is that the testator was aware of the property which he was disposing of and the manner in which it would be distributed, knew the natural objects of his bounty, and understood the significance of his disposition. *Melody v. Hamblin*, 115 S.W.2d 237, 242 (Tenn. Ct. App. 1937). "The testator must have an intelligent consciousness of the nature and effect of the act, a knowledge of the property possessed and an understanding of the disposition to be made." *Estate of Elam*, 738 S.W.2d at 171 (citation omitted). A strong presumption exists that the testator possessed the requisite capacity to know and understand his actions at the time he executed his will. "Inquiry must center on the decedent's mental condition at the time of execution of the will, and a

contestant must introduce strong evidence to establish a lack of testamentary capacity at the time of the execution of the will." ***Keasler***, 973 S.W.2d at 217.

In this case, even those witnesses who expressed the belief that McIntyre had not been of sound mind at the time he wrote the suicide notes acknowledged that McIntyre always knew his family. In the notes, McIntyre listed his various accounts in detail, by name, account number, and latest account balance. He gave Mrs. McIntyre detailed instructions on the location of his savings bonds and the office of a person with whom he had placed some investments. Virtually every close family member and friend was mentioned by name. Moreover, he explained the reason for leaving the bulk of his estate to his wife, writing that she had been "a dear and understanding partner in life," and she was the one who would be "affected and hurt the most" and would "need it all." "While proof of the reason for making a disposition is not necessary, it is nevertheless relevant to show the testator knew the force and consequences of his act." ***Estate of Elam***, 738 S.W.2d at 172. Clearly there was substantial evidence that McIntyre was aware of the property of which he was disposing and the manner in which it would be distributed, the natural objects of his bounty, that he understood the nature and effect of his act. ***See Melody v. Hamblin***, 115 S.W.2d at 242; ***Estate of Elam***, 738 S.W.2d at 171.

The Contestants also argue that the trial court erred in its jury instructions. The Contestants sought a specific instruction on suicide which stated that "a person's will is not valid where he makes it in contemplation of suicide, and under the influence of morbid and unhappy feelings which in fact lead to his suicide, if those morbid and unhappy feelings deprive him of testamentary capacity." They maintain that the trial court erred in refusing to give this instruction.

The trial court is afforded discretion in the substance of its jury instructions, so long as the instructions given are substantially accurate concerning the applicable law. ***Mitchell v. Smith***, 779 S.W.2d 384, 390 (Tenn. Ct. App. 1989). The trial court need not give a specific instruction, the substance of which is covered in the general charge given to the jury. ***Id.*** In this case, the trial court instructed the jury that it should consider "matters that show the person's mental condition at the time the will was made," and that it could consider the "person's appearance, conduct, declarations, conversations and all other evidence of that person's mental condition, both before and after the will was made." We find that this jury instruction was sufficient, and that the trial court did not abuse its discretion in denying the Contestants' requested instruction on suicide.

The Contestants also contend that the trial court erred in permitting the Proponents' expert witness, Dr. Paul King, to testify that the testator had testamentary capacity, and in allowing him to offer opinions which were not rendered to any degree of medical certainty. In this case, Dr. King testified as a treating physician and as an expert witness. He testified that McIntyre exhibited no signs of psychosis, and was always oriented as to person, place and time. His opinion as to McIntyre's mental state was based on his evaluation and treatment of McIntyre as a patient. Moreover, under Rule 704 of the Tennessee Rules of Evidence: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue

-12-

to be decided by the trier of fact." Under these circumstances, we find no error in the admission of Dr. King's testimony.

Finally, the Contestants argue that the trial court erred by permitting the Proponents to ask leading questions of a witness, by allowing a letter from the Proponents' expert to be read at trial, and by refusing to allow the jury access to certain exhibits. All of these issues involve evidentiary matters, over which the trial court has broad discretion. *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995)(citing *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992));. *Castelli v. Lien*, 910 S.W.2d 420, 425 (Tenn. Ct. App. 1995). We find no reversible error in the trial court's decisions on these issues.

The decision of the trial court is affirmed. Costs are assessed against the Appellants, Teresa Burns and Stacey Keith McIntyre, and their surety for which execution may issue, if necessary.

_____

HOLLY KIRBY LILLARD, J.