# SOUTHERN BELL TELEPHONE & TELEGRAPH COMPANY v. MYRTLE LEE. SOUTHERN BELL TELEPHONE & TELEGRAPH COMPANY v. W. C. LEE.—292 S. W. (2d) 45.

Western Section. April 22, 1955.

Petition for Certiorari denied by Supreme Court, August 2, 1955.

Waring, Walker, Cox & Lewis, Memphis, for plaintiff in error.

Harry Barnett, Memphis, for defendant in error.

AVERY, P. J., (Western Section). The record in this Court is that of two cases, one by Myrtle Lee for $75,000 damages, and one by her husband W. C. Lee for $25,000, both against the Southern Bell Telephone and Telegraph Company, coming to this court from the Law Court of Shelby County, Division Two, the Honorable John W. Wilson, Judge, where the cases were tried together to a jury, with separate verdicts and separate judgments, the verdict in one case in favor of Mrs. Myrtle Lee for $9,-500 and in the other case for her husband W. C. Lee in the amount of $500, which respective judgments were approved by the Trial Court upon motion for a new trial. The defendant below having preserved exceptions, prayed appeal to this Court, have perfected same, and assigned errors.

· The suit by Myrtle Lee was for personal injury to her body, particularly to her left knee and leg, and by W. C. Lee for damages sustained by him, as her husband for failure of consortium and expenses due to her injury.

Mrs. Lee was injured on May 12, 1953 about 2 o'clock P. M., when she alighted from her pick-up truck which she had stopped at the curb of 899 Pennsylvania Street, in the city of Memphis, had started walking from her pick-up truck to the Northside Fish Company, near where she had parked her truck, and as she walked across the grass plot near the sidewalk the surface dirt gave way under her left foot which sank into a shallow hole, causing her to almost fall, and severely injuring her left leg and knee. She was a heavy person, weighing over 200 pounds. A few days after the injury she was placed in the hospital where she was confined for 31 days with her leg and foot in traction. She left the hospital about the middle of July, 1953, after being fitted with a single outer-bar long leg brace and a cage knee attachment. Continuing to suffer she was again admitted to a hospital on August 5, 1953, where she was confined and operated on September 9, 1953, and finally dismissed from the hospital on November 17, 1953.

Facts alleged in the Declaration as the causes for the earth giving away under her left foot at the time she was injured are simple, concise, and while denied by the pleas, are practically admitted in the evidence and in the brief of Southern Bell Telephone and Telegraph Company, the plaintiff in error.

The Memphis Street Railway Company and the Southern Bell Telephone and Telegraph Company prior to, during and since the year 1934, jointly owned certain

poles, from which the trolleys of the Street Railway Company were supported and to which the telephone lines or wires of the defendant were attached. By the record of the Companies kept at the time, these poles were numbered, the number of the one in question being "3760" located on the west side of what is now Pennsylvania Street and about in the center of the block between Illinois Avenue and California Avenue, all in the City of Memphis. (Photostatic Record Exhibit attached to R. 095). On the records then kept, these jointly owned poles were designated by the letters B. M., the B meaning Bell Telephone Company and the M, Memphis Street Railway Company. Arrangement by the two companies for the replacement and upkeep of such jointly owned poles is referred to and explained, as shown by a letter dated June 12, 1931, addressed to Mr. Nathan Wood, Auditor, Electric Bond and Share Company, signed by R. W. McKee, then Supt. Overhead Lines for The Memphis Street Railway Company, photograph of which is exhibited with the record and attached to same at page 106. This letter refers to the joint contracts and agreements between the Memphis Street Railway Company and several companies, including the defendant company. It is not necessary to quote it in full, but the pertinent parts are as follows:

"As per your request, we are submitting, herewith, the following information regarding individual poles and contracts governing jointly owned poles of The Memphis Street Railway Company as of December 31, 1929."

The letter then sets out the names of the different companies having joint interest in poles, and further says:

"We have contracts which are general in scope, covering jointly owned poles. Also written agreements covering specific lines.

"Under all these agreements, jointly owned poles are maintained jointly. It has been the practice of the Railway Company to replace all two-way joint poles with the Southern Bell Tel. & Tel. Company and bill the Telephone Company for their part. * * * Each company transfers their own attachments at their expense."

On April 10, 1934, Southern Bell Telephone and Telegraph Company received a letter directed to the attention of its Mr. Vogt, written by the "Supt. Overhead Lines" of The Memphis Street Railway Company, saying:

"Gentlemen: We are attaching hereto list of 2-way joint poles of The Memphis Street Railway Company and Southern Bell Tel. & Tel. Company that have been condemned on our annual inspection.

"Kindly have these poles inspected and if you concur with us please furnish us with list of height of poles that you desire and we will replace same and bill you for one-half cost." (Ex. R. 100)

Attached to the foregoing letter was a list of 38 poles designated by number and by location, one of which was the pole in question, number "3760".

The defendant replied on the date of April 12, 1934 by its letter addressed to The Memphis Street Railway Company, to the attention of its Mr. R. W. McKee, in which it said:

"Gentlemen: In reply to your letter of April 10, 1934 with reference to replacement of the following

2-way joint poles, it will be agreeable with this Company for The Memphis Street Railway Company to make the replacements and bill the Southern Bell Telephone & Telegraph Company for one-half cost:''

(Exhibit attached R. 103)

That letter identifies a list of 16 poles described by number and location, one of which is the pole in question, number ''3760''.

On May 14, 1934, the ''Supt. Overhead Lines'' of the Memphis Street Railway Company, wrote a letter to defendant addressed to Memphis, Tennessee, and to the attention of Mr. B. W. Vogt, in which it said:

''Gentlemen: We have replaced joint poles at the following locations'' (here the poles by number and location are set forth, one of which is pole number 3760). ''Please transfer your attachments to the new poles and notify this company when all work is complete so that we may remove the old poles.'' (Exhibit R. 104)

On April 13, 1954, The Memphis Street Railway Company issued a ''work order'' to its ''Overhead Line Dept.'', by which it directed its Overhead Line Dept. to ''Replace the attached list of 19 defective poles owned jointly by M. St. Ry. and S. B. T. & T. Poles condemned on annual inspection. Bill SB T. & T. ''one-half cost.''

(Exhibit R. 109)

On Sept. 12, 1954, The Memphis Street Railway Company billed the defendant for $304.69, one-half of the total bill itemized specifically and to which is attached list of 16 replaced joint owned poles, one of which is number

3760. The notation on this bill, which is a completely itemized bill, is:

"One-half cost of replacing the attached list of defective poles." (Two page Exhibit attached R. 114)

At every point in the communications between the two companies where pole number "3760" is mentioned, its location is shown to be "Pennsylvania W. S. 2nd. S. Illinois".

Soon after the plaintiff, Mrs. Lee, was injured a work truck with lettering on its body showing it to be a Bell Telephone Company truck, appeared at the point where she was injured and removed from the place where her foot had sunk into the hole, the lower portion of a decayed wooden pole. The proof shows that the new pole which replaced this defective pole was located 5 or 6 feet from the point where the lower end of the defective pole was taken from the earth.

The Declaration alleged that the dirt was put over this stub of the defective pole when it was removed and that the grass and earth had covered over the surface above the hole occupied by the stub, so that the danger of its giving away was not noticeable by pedestrians walking over it. There is no necessity to further set out the recitations of the Declaration, nor that part of the pleas of defendant, either the specific or general issue pleas, but it is sufficient to simply say that specific pleas were filed along with the general issue pleas and that by proper order of the Court upon application of plaintiff, on June 2, 1954, before the hearing in these cases began on June 3, 1954, the defendant filed the following special plea:

"Comes the Defendant and for further special pleas to the Plaintiff's Declaration says that the stump of the pole upon which the Plaintiff relies in her original declaration was removed by The Memphis Street Railway Company and not by the Southern Bell Telephone & Telegraph Company; and furthermore that the pole presently standing on the W. side of Pennsylvania Avenue was likewise placed by the Memphis Street Railway Company and the Defendant relies on this plea as showing that it had no connection with the removal and installation of the pole and is not liable for any act of negligence in so doing." (R. pp. 017, 030)

At the conclusion of plaintiff's proof in chief, motions were made by defendant in each case for a directed verdict, based upon the grounds that:

"There is no proof whatsoever of any negligence on the part of the Telephone Company or that it did anything about this pole."

This motion was overruled and at the conclusion of all the proof, the defendant renewed its motion for a directed verdict in each case, counsel saying:

"The defendant now moves the Court to direct a verdict in its favor, in both Mrs. Lee's case and Mr. Lee's case. In Mrs. Lee's case on the ground that the Telephone Company is not responsible for the acts of the Memphis Street Railway Company in moving the pole in the manner in which they did it. And, in Mr. Lee's case, the same ground, plus an additional ground, they haven't shown any loss or any damages. All they have shown is that his wife had to do some work around the house and that he

had to get somebody to help her, and he did it himself, but as far as monetary damages is concerned, there is none. I further ask the Court to rule out any question of punitive damages in either case." (R. 124)

The Court then said:

"I am not going to submit any question of punitive damages and confine the other to companionship and * * *. I am going to overrule the motion except as I said, I am not going to submit any question of punitive damages." (R. 124, 125)

Assignments of Error Nos. I and II are leveled at the averment that the Court erred in not directing the verdict and that there was no evidence to support the verdict.

Assignments of Error Nos. III and V embrace alleged errors which call for the same determination in this Opinion as that of Assignments of Error Nos. I and II, all four of which will be considered together hereinafter.

▆ Assignment of Error No. IV is leveled at a portion of the Charge as follows:

"Now, gentlemen of the jury, it is undisputed in the evidence that the pole in question was jointly owned by the defendant Telephone Company and the Memphis Street Railway Company at the time the pole was removed. It is not disputed that the pole was removed by the Memphis Street Railway Company and the defendant Telephone Company paid one-half of the cost of removal."

This Assignment of Error will be overruled without referring to the evidence. In the first place, it is not discussed in the Brief and Argument of plaintiff in error,

and on the contrary, the following statement appears in the Argument:

"It is admitted that the old pole was jointly owned by both the Street Railway Company and the Telephone Company, each one of them using it."

At another place on the same page of the Argument, it is said:

"When it became necessary to remove the pole the Memphis Street Railway Company undertook to do this work, and did take down the old pole, but left a stub or stump in the ground. The Telephone Company merely assented to moving the old pole, but had nothing to do with the actual work itself. Thus it is undisputed that The Memphis Street Railway Company did all of the work in removing the old pole, and placing a new one, and in doing so it left a stump or stub in the ground, * * *."

At another place on page four of the Argument, it is said:

"From the audit of The Memphis Street Railway Company's books, William Anderson, as auditor and general bookkeeper, testified that the Street Railway Company paid for one-half of the work."

And on page three of defendant's Brief, it is shown that G. W. Kimbrough, the District Engineer for the defendant Telephone Company, testified as follows:

"* * * That if The Memphis Street Railway Company replaced the pole the Telephone Company would pay for one-half of the actual work of replacement, although it had nothing to do with removing it."

It is set out hereinbefore just exactly what happened with respect to the work and the payment for same, which exactly conforms to the complained of part of the Charge as set out in Assignment of Error No. IV.

Assignments of Error Nos. VI, VII and VIII are each leveled at the refusal of the Trial Court to charge certain special requests made by defendant. These special requests will be set out verbatim hereinafter but will be jointly considered, as each of them calls for the same consideration of both facts and law.

Assignment of Error IX is simply that:

"The Trial Court erred in refusing to grant the defendant a new trial upon the grounds above set forth."

A determination of the other Assignments of Error will, of course, determine this Assignment of Error No. IX.

What amounts to a joint adventure can only be determined by the terms of the particular agreement between the parties, and largely upon the construction which the parties themselves have given it, as indicated by the manner in which they have acted under it and upon the nature of the undertaking, as well as upon other related facts. Therefore, the decisions of our Courts, with respect to particular kinds of undertaking only serve as guides in determining whether or not a given statement of facts is sufficient to show the creation of a joint adventure, joint venture and joint enterprise, as the terms are sometimes used to mean the same, though they are not always legally synonymous.

The text writers furnish a general rule by which the negligence of one party may be imputed to another party, to which we may apply a certain set of facts, but none that fits every peculiar existing factual situation. That general rule may be stated as follows:

"If two or more persons unite in a joint prosecution of a common purpose under such circumstances that each has authority, express or implied, to act for all in respect to the control of the means or agencies employed to execute the common purpose, the negligence of one in the management thereof will be imputed to the others, is based upon the fact that the parties were engaged in a joint enterprise.

"But parties cannot be said to be engaged in a joint enterprise within the meaning of the law of negligence unless there be a community of interest in the object or purpose of the undertaking, and an equal right to govern and direct the movements and conduct of each other with respect thereto; each must have some voice and right to be heard in its control or management." 48 A. L. R. p. 1061, and other cases cited.

Since we are going to consider Assignments of Error Nos. III and V together with Assignments of Error Nos. I and II, it seems proper to set them forth verbatim at this point in this Opinion, and they are as follows:

"No. III

"The Court erred in the following statement, which he made during the course of the argument.

" 'The Court: Pardon me a minute. Do you think that argument, in view of what the Court has ruled I am going to charge the jury, is necessary?

" 'Mr. Barnett: I am describing the evidence.

" 'The Court: I don't see it is material to the issues because as I have ruled this morning, that I am going to instruct this jury that if the Street Railway Company was negligent in removing this pole, that negligence could be imputed to the Telephone Company. So, we only have the question here is whether or not the Street Railway Company was negligent in removing the pole and as to whether or not that negligence, if any, was the proximate cause of the injury. You may go ahead with your argument, but it looks like to me it is unnecessary.

"Mr. Barnett: I am just going over it lightly. So, we have a right to come into court today. If we didn't we would have been thrown out.' " (Tr. 143)

"No. V.

"The Court erred in charging the jury as follows:

" 'Now jurors, under the uncontroverted facts in this case, I charge you as a matter of law that the negligent act of the Memphis Street Railway Company in removing the pole, if they were negligent, would be imputed to the defendant, Southern Bell Telephone and Telegraph Company; that is, the negligent act of the Street Railway Company, if any would be the negligent act of the Southern Bell Telephone and Telegraph Company.' " (Tr. 144)

These two Assignments are leveled at the determination by the Trial Court that, as a matter of law, the negligence, if any, of the Memphis Street Railway Company, would be imputed to the defendant Telephone Company. Thus, two questions arise from these Assignments:

(1) Is it to be determined by the jury and as a matter of fact, in each case wherein the doctrine of joint enterprise or adventure is invoked to determine whether such joint enterprise or adventure actually exists?

(2) Are the undisputed facts, as revealed by this record, such as justified the Court in making such determination as a matter of law?

The same factors are not required to exist in every case in order that a joint enterprise may be established, though some of the factors thus necessary must appear in every case of joint enterprise. The factors appearing in the instant case, and which are undisputed, must determine whether or not the Trial Court was correct in finding, as a matter of law, that the negligence of the Memphis Street Railway Company was imputable to the defendant, Southern Bell Tel. & Tel. Company.

What are these appearing factors? They are:

(1) Joint ownership or equal ownership of the pole in question;

(2) Jointly-owned poles were maintained jointly;

(3) Each owner had the right to inspect and determine for itself; whether the pole was in such condition as it should be condemned and replaced;

(4) Each owner exercised this respective authority and so notified each other of the result of the inspection, both concluding the necessity to condemn and replace the pole;

(5) Each owner contributed one-half of the total cost of replacement;

(6) It had been the practice of The Memphis Street Railway Company and the Southern Bell Tel. & Tel. Company to permit the Railway Company to replace all condemned jointly-owned poles;

(7) In replacement of jointly-owned poles with a higher pole, the cost of replacement was taken care of by the Company desiring the additional height, in which event the Company making replacement salvaged the pole removed;

(8) Each Company transferred their respective attachments from the old pole to the new pole at its own expense.

Were the foregoing eight factors, undisputed in the proof, sufficient to justify a Trial Court in determining that each Company had a right, whether it exercised it or not, of control over the removal of the pole. While the same factors may be said to control the rights of the parties in the placing of the new pole, neither the Trial Court nor this Court is concerned with respect to the placing of a new pole. It was not the placing of the new pole that finally led to the accident resulting in the injury of the plaintiff. The thing that led to the accident which produced the injury was the removal of the old pole and made no difference whether the old pole was replaced by a new pole at or near the location of the old one or anywhere else on the lines of the Company.

It is insisted by the defendant that it had no control or right of control over the removal of the old pole; and further, that if the issues are to turn upon the question of the "defendant's right of control over the removal of the old pole", then that would constitute a question to be determined by the jury. The province of the jury, if it presents a jury question, was invaded by action of the Trial Judge.

Defendant relies principally upon the case of Schwartz v. Johnson, 152 Tenn. 586, 280 S. W. 32, 47 A. L. R. 323, supported by the texts in 30 Am. Jur., Joint Adventure, p. 682, sec. 11, and p. 712, sec. 64. The last above mentioned citation to Am. Jur. is as follows:

"It may be noted here that where the existence of the relation of joint adventurers is an issue and there is substantial evidence tending to prove that the parties intended to join their efforts in furtherance of the enterprise for their joint profit, the question of such an existence is for the jury."

In the Schwartz case, supra, young Schwartz was killed while riding in a car with his young friend Johnson. The car belonged to Johnson's father. Both boys were drinking and were riding around in the Johnson car. Young Johnson admitted that he and Schwartz had each taken about 12 drinks of white corn whiskey and there was testimony of others to the fact that the boys were intoxicated to a considerable extent. Schwartz' administrator sued the elder Johnson, undertaking to hold him liable for the negligence of the younger Johnson in the operation of the automobile. The Court submitted the case to the jury on all questions of fact, in which there was one theory that Schwartz and Johnson were on a joint

adventure. The Court of Appeals was of the opinion that the boys were engaged in a joint adventure and that there should have been a verdict directed in favor of the defendant. In overruling this Opinion of the Court of Appeals on this particular point, the Supreme Court said:

"We doubt if this is a case of joint enterprise, in which the negligence of the driver of the car in respect to its operation could be imputed to his companion.. The car belonged to the elder Johnson, who allowed it to be used by his son, and the son was running the car. It does not appear that the Schwartz boy was undertaking to direct the operation of the car, or had any authority so to do. A witness who saw the car just before the collision said that Schwartz was sitting at the side of young Johnson, not interfering with the driving of the latter. Other circumstances appear in the proof, which it is useless to detail, and from all of this we are not able to conclude that young Schwartz was anything more than the guest of young Johnson, riding in a car of which the latter had full control."

And the Supreme Court then said:

"Under such proof, there is no joint adventure. In a joint enterprise, in order to impute the negligence of one of the parties to the other, each must have authority to control the means or agencies employed to execute the common purpose." (Citing authorities.)

Following the above, our Supreme Court approved the language in the case of Cunningham v. City of Thief River Falls, 84 Minn. 21, 86 N. W. 763, in which that Court said:

" 'Parties cannot be said to be engaged in a joint enterprise, within the meaning of the law of negligence, unless there be a community of interest in the objects or purposes of the undertaking and an equal right to direct and govern the movements and conduct of each other with respect thereto. *Each must have some voice and right to be heard in its control and management.*' " (Emphasis ours.)

We do not think the Schwartz case, supra, is authority for the position taken by the defendant. In fact it seems to us that, if it is authority for the position of either of the parties in the present litigation, it supports the contention of the plaintiff. There was no joint ownership of the car which was the means of transportation of Schwartz and Johnson, but in the instant case there is a joint ownership of the pole which supports both the wires of its joint-owners. It is true that the wires are used for separate purposes by the respective owners and that the use of the facilities attached to the pole which belonged to the Telephone Company were not under the control or authority of the Street Railway Company, a vise versa, but each of the owners exercised and reserved the right to determine its condition before replacement. Each company authorized the other to do the replacement at half expense to the other.

We do not think the case of Logwood v. Nelson, 35 Tenn. App. 639, 646, 250 S. W. (2d) 582, 585, also cited by defendant, controls the instant case. That is another damage suit growing out of an automobile accident, and is perhaps the strongest case yet decided by our Tennessee courts, wherein it has been held that the question of whether the action of the parties constitutes a joint enterprise is one for the jury.

This is a case in which Mrs. Nelson sued her daughter, Mrs. Logwood, and one E. L. Coffee, to recover damages for personal injuries sustained as the result of a collision between an automobile driven by Mrs. Logwood, in which Mrs. Nelson was riding, and an automobile owned and operated by defendant Coffey. Her husband sued for loss of services and medical expenses in the same matter. Both cases were tried together.

The defendant's appeal is predicated solely upon the insistence that a verdict should have been directed in his behalf at the close of all the evidence upon the theory that Mrs. Nelson and Mrs. Logwood were engaged upon a joint enterprise and that the negligence of Mrs. Logwood, implicit in the verdict of the jury, operates to bar the action against him.

The further facts were that sometime prior to the accident, Mrs. Nelson's son, a brother of Mrs. Logwood, was stationed at an Army Camp near Atlanta, Georgia. Apparently his car had been left at the Nelson home and he had written Mrs. Nelson, requesting that she procure a driver and send his car to him and that he would pay all the expenses of the trip to Atlanta with the car and transportation for the return trip. Mrs. Nelson had made efforts to secure a driver but had not been able to find anyone willing to make the trip except her daughter, Mrs. Logwood. Mrs. Nelson was unable to drive the car and the record is silent as to her purpose in going along with Mrs. Logwood. It was at the son's request that the parties were proceeding with the son's car along Highway 11-W at the time of the collision. The Court therein gave a complete analysis of the case of Schwartz v. Johnson, supra, and also the case of Berryman v. Dilworth, 178 Tenn. 566, 160 S. W. (2d) 899, and applying the

Opinions in the Schwartz and Berryman cases to the facts of the Logwood case, the Court said:

"Obviously, under these holdings, there are lacking the essentials of a joint enterprise. Mrs. Nelson acted merely as an intermediary in securing the driver for her son. There is no proof that her purpose in accompanying Mrs. Logwood on the trip was anything more than the pleasure of traveling with her daughter and visiting her son at camp. It is clear that she did not go along on the trip to control or direct the movements of the car since, apparently, she knew nothing about the operation of an automobile. So far as appears, the trip could have been made as well without her. She said no part of the expenses and no right of control or attempt to control is shown.

"The burden of proof was upon defendant Coffey to show that the contributory negligence of Mrs. Logwood was imputable to Mrs. Nelson, the plaintiff."

And immediately following the above quoted statement, it is said by the Court 35 Tenn. App. on page 646, 250 S. W. (2d) at page 585, of the Logwood Opinion, that:

"At the least, under the facts of the case, the question of the existence of a joint enterprise was for the jury. See cases collected at 48 A. L. R. 1083."

The exhibited written communications between the Companies filed with the record and hereinbefore referred to, show the undisputed existence of the factors above set forth, and not only is that true, but the plaintiffs introduced Mr. G. W. Kimbrough, the District Engineer for the Southern Bell Tel. & Tel. Company at the time of the

hearing, and on cross-examination he was asked the following questions and made the following answers:

"Q. In making restoration of poles, whether they are unfitted for use or for other reasons, and you have have joint ownership, does one company do the work and put in a new pole, or do you both do it together? A. Generally one company or the other does the pole work. I am not too familiar with how the replacement is handled, and I have nothing to do with joint ownership, but I do know from my own knowledge that certain poles that were jointly owned, one company or the other did all of the pole work; for instance, the Telephone Company would set the new poles, transfer the attachments, and that crew would leave an order, and a few days later, or a week later the other company's crew would transfer their attachments, and that would clear the old pole, and later the Telephone Company would come back and pull the old pole.

"Q. If the Street Railway Company did the replacing would they follow the same schedule? A. Yes, sir." (R. 73, 74)

On re-direct examination, he was asked and answered:

"Q. Mr. Kimbrough, one other question. Assuming that the Street Railway Company did all the work on this pole, installing and possibly transferring all of the wires, we will say, would the Telephone Company be billed for the work that was done by the Memphis Street Railway? A. In the first place,—let's get this straight. If the Street Railway Company did the pole work they did not handle

the Telephone Company's attachments on the pole. We handle our own. But they did all of the pole work, let's assume, in replacing the pole, then they would bill us, if it was jointly owned, for half of it.

"Q. In other words, if it was $100 you would pay $50? A. Right." (R. 74)

Defendant introduced Mr. Russell Eley, who is evidently an official or trusted employee of the Memphis Street Railway Company, for by him many or all of the exhibited written communications between the companies were identified, but the record fails to show what position he holds or how he got possession of the records which he introduced. His identification as an individual and as an employee or official of The Memphis Street Railway Company is found in the first few questions and anwers, which are as follows:

"Q. You are Mr. Russell Eley? A. Yes, sir.

"Q. Now, Mr. Eley, your company had to get the consent of the Telephone Company, by their inspection, to say also that the pole was defective and condemned, is that right? They had to go out and investigate it, from that letter? A. That is true.

"Q. You did not install the pole without consulting the Telephone Company and getting their approval as to its defective condition? A. That is right.

"Q. After you installed the pole, and if it cost $100, if that was the cost of the pole and labor, you would send them a bill for $50, is that right? A. Yes, sir.

"Q. And when the pole was taken out of the ground, and if it took two men half a day at a cost of $25 to take the pole out, you would send them a bill then for $12.50, wouldn't you? A. Well * * *

"Q. You would split the expense? A. That is true. Whatever the cost was, it would be divided. That is true. The installation of a new pole, and the cost of the removal of the old pole, the cost of that would be divided.

"Q. And what you billed the Telephone Company, a part of that bill would be removing the old pole, would it not? A. Yes, sir.

"Q. Half of it? A. Total expense of labor and material." (R. 92, 93)

Defendant introduced as a witness, Mr. William Anderson, whose testimony shows him to be the Auditor and General Bookkeeper of The Memphis Street Railway Company, which position he also held in 1934. He testified that R. 114 hereinabove referred to, is the bill rendered by The Memphis Street Railway Company to the Southern Bell Tel. & Tel. Company in connection with the involved pole and others, whereby the defendant Telephone Company was billed for one-half of the costs. We have hereinbefore stated that this bill shows that it was rendered for "one-half of the costs of replacing defective poles", and on cross-examination he was asked and answered:

"Q. Mr. Anderson, you speak of defective and condemned. What is meant by that, the condition of the pole, would you mind describing that, sir? A. They were in a hazardous condition, they were rotted out at the bottom, and needed to be replaced.

"Q. The fact this pole was rotted out at the bottom makes it dangerous? A. In 1934; yes, sir." (R. 115)

The defendant introduced Mr. B. W. Vogt, who was District Engineer for the defendant Telephone Company in 1934, but now retired. He was asked about how the companies handled the jointly-owned pole situation, and in making his explanation, from his memory, he was asked and answered:

"Q. Mr. Vogt, do you have any personal knowledge of this pole down there on Pennsylvania Avenue? A. No, I do not, unless you have a letter or memorandum showing the ownership and the transaction, because new poles that were replaced were inspected by the Street Railway Company, I was notified that the pole was bad, and would receive a letter from Mr. McKee, who at that time was Superintendent of Overhead Lines, and he would ask me to go out and inspect the pole and notify him, and I would do that, and I would then write him a letter telling him that it was O.K. for the Street Railway Company to make a replacement, billing the Telephone Company for one-half cost of the replacement, which covered the removal of the old pole and the new pole.

"Q. In that case, where the Telephone Company simply authorized a new pole to be set, and your company was billed for one-half of it, did you as a District Engineer, or any other telephone official undertake to supervise that work? A. No, sir; that was left up to the Street Railway Company to set the pole. Now of course when it came to the transfer-

ring of the attachments, that was handled by the Telephone Company and supervised by them." (R. 118, 119)

On cross-examination, this witness testified with respect to the pole in question, in part:

"Q. If it was classified as condemned and defective in 1934 it would be a rotten pole and had to be removed? A. Yes, if that pole was included in the letter of Mr. McKee it was a bad pole, and I inspected it and then I wrote Mr. McKee a letter telling him about it.

"Q. Could that pole have been removed without the approval of the Telephone Company? A. Not unless the Street Railway Company wanted to take it out themselves on their own and without costing the Telephone Company anything.

"Q. But in order to get the money from the Telephone Company they had to get the approval of the Telephone Company for the removal of this pole, did they not? A. It would have to be a certain height pole, and the Street Railway Company had wires on it, and we would have used our judgment about what size or height of pole would have been set in there.

"Q. Would that have been done, Mr. Vogt, without consulting the Telephone Company? A. No, sir.

"Q. It makes no difference who works on these poles, the expense is divided, is it not? A. They would bill the Telephone Company for their proportional part of the expense.

"Q. If the Telephone Company put in a pole they would send half of the bill to the Street Car Company? A. If the Telephone Company replaced a pole they would have a letter from the Street Railway Company advising them that it was all right, and they would be billed for half of the cost.

"Q. In other words, it makes no difference which company actually worked on the poles, installing them or removing them, the Phone Company would pay half and the Street Railway would pay half of that? A. That is if it was a joint pole." (R. 120, 121)

Throughout the examination of all the witnesses introduced by the two companies who knew anything about the practice between the companies with respect to pole replacements, it was testified that the company doing the actual work of replacement had its own workmen and employees on the job, and that these workmen and employees did all the work necessary to a complete removal of old poles and installation of the new; that the company who was billed for one-half of the cost had no control over the methods used or over the employees doing the work; that the only work actually done by the billed company in connection with such change was the work of taking loose its attached facility from the old pole and attaching it to the new pole, and that such arrangement was the common practice between the companies.

Now, notwithstanding this common practice between the companies, can it be said, as relates to the general public and particularly to a person injured in the way and manner the plaintiff claims to have been injured, that such arrangement relieved either of the joint owners

from keeping its facilities,—in this case the pole, and the hole in the ground in which the pole was set, in such condition as to afford reasonable safety from being injured on account of any defective condition known to either or both of them, but not discernible to the public by ordinary care or diligence, which might have existed? The stub or stump of the pole left in the ground was still jointly owned by the companies and it was as much their responsibility and respective duty to keep that stub and its location in such condition as that the public, who had no reasonable warning of the existence of the danger of the surface giving away over the hole after the decay of the stub, would not be injured in the way and manner described by the plaintiffs, as it was to safely set a new pole in the ground so that it would not fall and injure someone.

We, therefore, feel constrained to and do overrule Assignments of Error I, II, III and V.

The Telephone Company, by its Assignments of Error VI, VII and VIII, insists that the Court erred in failing to charge the respective special requests, each of which are in different phraseology but requesting the Court to charge the jury, in effect, that before they can find for the plaintiffs they must find that the Southern Bell Tel. & Tel. Company controlled or had the right to control The Memphis Street Railway Company and its employees in the operation of moving the pole in question, and that by refusing these special requests and charging that the negligence of the Street Railway Company was attributable to the Telephone Company, he had invaded the province of the jury.

.The Assignment of Error IX is in the following words:

"The Trial Court erred in refusing to grant the defendant a new trial upon the grounds above set forth."

Counsel for the Telephone Company have referred to this Court four cases in their brief which they claim supports their position in this regard, the first of which is Hoge v. George, 27 Wyo. 423, 200 P. 96, 18 A. L. R. 469. We think that case has no application. It was a suit between two alleged joint adventurers,—one insisting that there was a joint enterprise and bringing his suit for his share of the profits arising therefrom, and the other insisting that there was no joint enterprise and, if there was a contract for joint adventure, no consideration existed for it. The suit grew out of an agreement between the parties to purchase an estate known as Riverside Park in the State of Wyoming. The evidence sharply conflicted and on the question of consideration, the Court said:

"A promise, express or implied, to contribute capital or labor to an enterprise, is a good consideration for a joint adventure contract."

With respect to the question being one for the jury, the Court said:

"Where the existence of the relationship is in issue, and there is substantial evidence tending to prove that the parties intended to join their efforts in furtherance of the enterprise, for their joint profit, the question is preeminently one for a jury."

Another one of the cases relied upon is that of Murray v. Williams, 4 Cir., 114 F. (2d) 282. That case was in

the appellate court on two different occasions. It is first reported in Williams v. Murray, 4 Cir., 99 F. (2d) at page 279. There had been a directed verdict in favor of the defendant below, and as in the case of Hoge v. George, supra, it was a suit between two persons to a joint enterprise, one seeking to recover of the other his part of the profits growing out of a contract between them for the purchase of capital stock of a water power corporation which was consummated, and later agreeing to a joint adventure or enterprise regarding development. When the case was before the appellate court at first, and at page 281 of 99 F. (2d), the Court in conclusion said:

"We have touched upon important aspects of the evidence; but of course we express no opinion as to the merits of the controversy. It is our judgment, however, that there was such a conflict in the evidence that the issue raised by the pleadings should have been submitted to the jury."

The case was again tried in which there was a judgment for many thousands of dollars, carried back to the appellate court, the plaintiff in error in the last case being the defendant in error in the first case, and in confirming the verdict and judgment of the Court denying the insistence of the plaintiff in error, at that time, that there should have been a directed verdict in his behalf, the Court said:

"We can find nothing in the record at the second trial that would cause us to change the conclusion reached in our former opinion, *that there was such a conflict in the evidence* that the issue raised by the pleadings should be submitted to the jury." (Emphasis ours.) [144 F. (2d) 283.]

There is no conflict in the proof in the instant case. The facts are undisputed. It therefore was a question of law for the Court to determine from the undisputed facts, and we think the Trial Court's action proper.

The third case by which counsel seek to justify their position that the question was one to submit to the jury was that of Melody v. Hamblin, 21 Tenn. App. 687, 115 S. W. (2d) 237; and the fourth case is that of Fisher v. Travelers Insurance Company, 124 Tenn. 450, 138 S. W. (2d) 316.

In neither of these cases was the question of joint enterprise involved. The first was a contested will case. Many assignments of error were made to the effect that the Court had erred in refusing to submit to the jury special requests. The Court simply said they were covered by the general charge and need not be charged specially. In the case of Fisher v. Travelers Insurance Company, the plaintiff sought to recover damages for injury received while riding on a Memphis Street Railway Company vehicle. Several assignments of error were leveled at that which the Court did charge and several were leveled at the failure or refusal to charge special requests. The only possible similarity between the issues there and the issues in the instant case is that it was said in the Opinion that a special request which invades the province of the jury should be refused, and also that a charge of the Court to the jury which invades the province of the jury was improper.

There is nothing in the instant case, sofar as the evidence is concerned, which required the Trial Court to submit to the jury the question of the right of the Southern Bell Tel. & Tel. Company to control the work

done by the employees of The Memphis Street Railway Company, for the simple reason that the instrumentality was owned by the two companies as partners, and the contract between them for the removal of the pole is susceptible of but one interpretation and the evidence on the trial, with respect to the removal, is susceptible of but one interpretation.

It is entirely logical to conclude that the relationship of The Memphis Street Railway Company and the Southern Bell Tel. & Tel. Company in the joint ownership of the pole, through mutual understanding and agreement with respect to condemnation and replacement of defective poles, as shown by the record, though each used the jointly owned poles for a distinct and separate purpose, constituted such a limited partnership as that each member of the limited partnership, while acting within the authority each had given to the other, to perform services for each other necessary to the protection of the limited partnership property, had created such an agency as that the negligent acts of one member of the limited partnership would make both or each partner liable for the resulting damages.

The Trial Court did not state the legal basis for his determination why, as a matter of law, the negligent acts of the Street Railway Company in moving the old pole were imputable to the Telephone Company,—that is, whether he based it upon the question of agency growing out of a partnership or upon the theory of being simply a joint enterprise. It may be presumed, however, that he viewed the situation solely from the legal viewpoint of a joint enterprise, for that relationship was and is the stated basis of counsel for the defendant by which defend-

ant there sought and here seeks to be relieved of any liability for the injuries to plaintiffs.

We have heretofore set out eight specific factors, undisputed in this record, each of which supports the position taken by the Trial Court to the effect that the negligence of The Memphis Street Railway Company and its employees in moving the defective pole, if any, was imputable to the Southern Bell Tel. & Tel. Company, under and by virtue of these undisputed facts. The minds of reasonable jurors could have reached but one conclusion. These facts we have set out hereinabove in discussing the other assignments of error, and will not repeat them.

The result is that all of the Assignments of Error are overruled, the judgment of the Lower Court affirmed, and judgment will be entered in this Court against the Southern Bell Tel. & Tel. Company, and in favor of each of the plaintiffs, in the amounts of the respective verdicts and the judgments below, together with interest thereon from date of the judgments of the Lower Court overruling the motion for a new trial, and entering judgment in favor of each defendant together with the costs.

Carney and Bejach, JJ., concur.